# EXHIBIT A

 Confidential

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement") is entered into as of December 18, 2008 (the "Effective Date") among EMC Telecom Corporation, a Nevada Corporation ("EMC" or "EMCT"), and UV2, Inc. a(n) Michigan Corporation ("Seller"), with its principle business location 648 Monroe Avenue NW, Suite B007, Grand Rapids, Michigan 49503, and David Szostek, individually, ("Stockholder").

### RECITALS

A. WHEREAS, Seller and Target among their businesses is engaged in the business of providing one or many of the following: paid internet data services, including, but not limited to: internet access, web hosting, internet security, managed services and related services, which is marketed traditionally and also through the internet via the Universal Resource Locator ("URL" or "URLs"): Myriad.com and all related websites offering the same or similar services under management by Seller (the "Asset" or "Assets"); and

B. WHEREAS, Seller owns and operate the Target and Seller is the record and beneficial owner of One-Hundred Percent (100%) of the Equity Securities of Target.

C. WHEREAS, the Seller has represented that they are the record owner and holders of One-Hundred Percent (100%) of issued and/or outstanding shares of the capital stock of Target and;

D. WHEREAS, the EMCT desires to purchase the Approved Assets of said Target, and the Seller desires to sell the Approved Assets, upon the terms and subject to the conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, and in order to consummate the purchase and the sale of the Approved Assets of the aforementioned Target, the parties hereby agree as follows:

### ARTICLE 1 – DEFINITIONS

1.1 Terms used but not otherwise defined in this Agreement shall have the meanings defined in Exhibit A hereto.

### ARTICLE 2 – PURCHASE AND SALE OF APPROVED ASSETS

2.1 Subject to the terms and conditions set forth in this agreement, on the closing date, Target will transfer and convey the Approved Assets to EMCT and EMCT will acquire the Approved Assets of the Target from the Target.

2.2 As payment in full for the transfer of the Approved Assets, EMCT shall make the following payments:

   2.2.1 Purchase Price: EMCT will purchase the Approved Assets for purchase price of Six-Hundred and Seventy-Three Thousand and Eight-Hundred and Fifteen Dollars ($673,815) ("Purchase Price") subject to the provisions of this Agreement.

   2.2.2 Closing (Initial Payment): One-Hundred and Sixty Thousand Dollars ($160,000) of the Purchase Price will be paid on the Closing Date of this Agreement ("closing").



2.2.3 Sixty-Day (Second Payment): Two-Hundred and Forty Thousand Dollars ($240,000) of the Purchase Price to be paid at the completion of the Migration/Integration Period. This is to ensure Seller cooperation during the mission-critical operational needs that may arise.

2.2.4 Six-Month (Third Payment): Fifty Thousand Dollars ($50,000) of the Purchase Price to be paid at the completion of the first six months following the closing date of this Agreement.

2.2.5 Twelve-Month (Fourth and Final Payment): Two-Hundred and Twenty-Three Thousand and Eight-Hundred and Fifteen Dollars ($223,815) of the Purchase Price to be paid at the completion the first twelve months following the closing date of this Agreement.

2.2.6 Completion of any and the Migration/Integration Period is scheduled to be completed within approximately Sixty Days (60) after the Closing Date.

2.3 Selling party, jointly and severally warrant that:

2.3.1 Target is a Corporation duly organized, validly existing, and in good standing under the laws of the State of Michigan; has all the necessary corporate powers to own its properties and to carry on its business as now owned and operated by it; is duly qualified to do intrastate business and is in good standing in any and all jurisdictions within which it has done business. Seller has all necessary corporate power and authority to own the respective properties and assets of the Target and to carry on its respective businesses as now conducted. True, correct and complete copies of the respective corporate charter documents of Seller as of the Effective Date have been delivered to EMCT. Seller is not registered or reporting under the Securities Exchange Act. Stockholder is the record and beneficial owner of One-Hundred Percent (100%) of Equity Securities.

2.3.2 All the Shares of the Corporation are validly issued, fully paid, and nonassessable and such shares have been so issued in full compliance with all federal and state securities laws. There are no outstanding subscriptions, options, rights, warrants convertible securities, or other agreements or commitments obligating Target to issue or transfer from treasury any additional shares of its capital stock of any class.

2.3.3 Shareholder as identified in Exhibit "G" hereto are the owner, beneficially and of record of One-Hundred Percent (100%) of the shares free and clear of all liens, encumbrances, security agreements, equities, options, claims, charges, and restrictions. Shareholders, and each of them, have the full power to transfer the Approved Assets to EMCT without obtaining the consent or approval of any other person or governmental authority.

2.3.4 Target does not own, directly or indirectly, any interest or investment (whether debt or equity) in any Corporation, partnership, business, trust, or other entity.

2.3.5 Target shall not (1) amend it's articles of organization/incorporation or bylaws; (2) issue any shares of its capital stock; (3) issue or create any warrants, obligations, subscriptions, options, convertible securities, or other commitments under which any additional shares of it's capital stock of any class might be directly or indirectly authorized, issued or transferred from treasury; or (4) agree to do any of the acts listed above.

2.3.6 Target shall not and shall not agree to (1) make any change in compensation payable to or become payable to any officer, employee, sales agent, or representative; (2) make any change in benefits payable to any officer, employee, sales agent, or representative under any bonus or pension plan or other contract or commitment; or (3) modify any collective bargaining agreement to which it is a party or by which it may be bound.

2.3.7 Target shall not and shall not agree to (1) declare, set aside or pay any dividend or make any distribution in respect of its capital stock; (2) Directly or indirectly purchase, redeem, or otherwise acquire any shares of its capital stock.

2.3.8 Target shall not and shall not agree to (1) pay any obligation or liability, fixed or contingent, other than current liabilities; (2) waive or compromise any right or claim; or (3) cancel, without full payment, any note, loan, or other obligation owed to the Target.

2.3.9 Target shall not and shall not agree to modify, amend, cancel, or terminate any of its existing contracts or agreements.

2.3.10 All warranties of the Selling party set forth in this agreement and made as of the day of the execution of this agreement shall also be true and correct on the closing date as set forth herein.

2.3.11 Selling party will have delivered to EMCT except as otherwise requested by EMCT, the written resignations of all of the officers and directors of Target and will cause any other action to be taken with respect to these resignations that EMCT may reasonably request.

## ARTICLE 3 - TITLE TO AND CONDITION OF ASSETS

3.1 To the Knowledge of the Seller and Target, the tangible personal property included in the Target's Approved Assets is in usable condition subject to exceptions which are, in the whole, not Material. Except as set forth in the Financial Statements or the Disclosure Schedule, the Target has good and marketable and unencumbered legal title to each of its Assets, free and clear of any claim, charge, easement, encumbrance, security interest, free and clear of any lien, option, pledge, right of others, or restriction (whether on voting, sale, transfer, disposition or otherwise), whether imposed by agreement, law, equity or otherwise except for any restrictions on transfer generally arising under any applicable federal or state securities law (Encumbrances). There is no pending or, to the Knowledge of the Target, threatened action that would materially interfere with the quiet enjoyment of such leaseholds by the Target. Seller agrees to transfer, convey and deliver to EMCT free and clear of all Encumbrances whatsoever (except Permitted Encumbrances), and EMCT agrees to accept from Seller, at the Closing on the Closing Date, all of the right, title and interest of Seller, in, to and under the following Assets of Seller insofar as they relate to or are used in the Target, whether tangible or intangible (collectively, the "Approved Assets"):

(i) each contract or agreement of Seller with **End-User Accounts** relating to the Target the form of which is set forth on **Exhibit B**;

(ii) the Books and Records relating exclusively to the Target, including **(A) all Existing End-User Account Information (e.g., all customer lists, email addresses, addresses, phone numbers, credit card information, bank information, billing histories, user ID's and passwords)** as well as any **database** or other **document** or **record containing Existing End-User Account information**, and (B) all **marketing intelligence** or **strategies** relating to the Target as well as any document or record containing such information to the extent that such marketing intelligence or strategies relating to the Target exist;

(iii) all affirmative causes of action, lawsuits, judgments, deposits, refunds, rebates, chose in action, rights of recovery, rights of set-off, rights of recoupment, claims and demands of any nature available to or being pursued by Seller with respect to the Target or ownership, use, function or value of any of the Approved Assets or Assumed Liabilities; and

(iv) all right, title and interest of Seller in and to the goodwill incident to the Target, including the exclusive right of the EMCT to hold itself out as carrying on the Target in succession to the Seller.



Confidential

(v) all right, title and interest of Seller in all Business Banking and Credit Lines related to the Target, including the right of the EMCT to hold itself out as carrying on the Target in succession to the Seller, unless otherwise determined by the parties and attached hereto.

(vi) all right title and interest in all **intellectual property** related to the Target Online Business Presence and Offline Business Presence including **trademarks**, **service marks**, **trade names**, **trade dress**, **patents**, **copyrights** in and to **programming code**, **content**, **data**, **images**, **text**, **graphics**, **design elements** and look and feel thereof.

(vii) all right title and interest in **software programs**, **modules**, **routines**, **data**, **text** or **graphic files**, **source** or **object codes**, and other **components** of the business used in the operation of the Target Online Business Presence and Offline Business Presence or in the **process** of being developed by or on behalf of Seller for use in the Online Business Presence and Offline Business Presence.

(viii) all right title and interest in all **accounts receivable** subject to the terms set forth in Article 5 herein.

(ix) All right and title to all **banking deposit accounts.**

(x) all right title and interest in and to any other asset of the Target.

(xi) Certain tangible property of Target as described in **Exhibit C.**

3.2 Excluded Assets.

Notwithstanding the foregoing, the purchase and sale contemplated hereby shall not include any assets of Seller not included in the Approved Assets **Exhibit C,** (collectively, the "Excluded Assets")

### ARTICLE 4 – LIABILITIES

4.1 Subject to Section 3.1.1, in connection with its obligations under this agreement, as of the Closing, EMCT shall assume and agree to pay, perform and discharge as they come due only, those obligations that are incident to the performance under the Contracts (other than the Excluded Liabilities) on or after the Closing Date (collectively, the "Assumed Liabilities"); provided, however, that EMCT shall assume no liability or obligation relating to any act or omission by Seller relating to the Contracts that occurred prior to the Closing Date. EMCT shall not assume any other Liabilities of Target, or be obligated to pay, perform, or discharge any other Liabilities of Target.

4.2 Notwithstanding anything to the contrary set forth in this Agreement, (i) all Liabilities of Target other than the Assumed Liabilities (the "Excluded Liabilities") shall be retained by Seller, and (ii) Seller shall convey, transfer and assign the Approved Assets to EMCT, in each case free and clear of all Encumbrances (except Permitted Encumbrances) and without any assumption by EMCT of any Liabilities of Target whatsoever (other than the Assumed Liabilities). Excluded Liabilities shall include any liabilities or obligations not expressly included in the Assumed Liabilities including:

(i) any Liability for Taxes of Target for any period;

(ii) any Liability for legal or other professional fees, costs, disbursements and expenses incurred by Target or any Affiliate of Target pursuant to or in connection with this Agreement and the consummation of the Asset Purchase;

---



(iii) any Liability arising out of any Action, product liability, breach of contract, warranty, tort, infringement or violation of Law or otherwise in connection with the operation of the Target or the ownership of the Approved Assets prior to the Closing Date, whether known or unknown, and whether arising prior to, on or subsequent to the Closing Date;

(iv) any Liability of Target or any ERISA Affiliate to or in connection with any Employee or other current or former employee, director, stockholder, agent or independent contractor of Target or any ERISA Affiliate arising, occurring or relating to any period up until the Closing Date, or with respect to any Employee Plan established, maintained, sponsored or contributed to by Target or any ERISA Affiliate;

(v) any and all Liabilities related in any way to the operations, assets or properties of Seller which are not part of the Target or the Approved Assets as of the Closing Date;

(vi) any Liability of Target to indemnify any Person by reason of the fact that such person was a director, officer, employee, or agent of Target or any of its Affiliates or was serving at the request of such entity as a partner, trustee, director, officer, employee, agent of Target or in any other capacity with another entity;

(vii)    any Liabilities with respect to Indebtedness of Target;

(viii)   any Liability with respect to any Excluded Asset; and

(ix)     any other Liability of Target arising under or in connection with any Contracts, leases, licenses, permits, commitments and other items of Personal Property or intangible personal property included in the Approved Assets or otherwise relating to the operation of the Target, in each case arising, or otherwise relating to the period, prior to the Closing Date.

(x)      any other Liability of Target arising under or in connection with any Contracts, leases, licenses, permits, or commitments included in the Approved Assets or otherwise relating to the operation of the Target, in each case arising, or otherwise relating to the period, following Closing Date due to breach of contract by Seller.

## ARTICLE 5 - ACCOUNTS RECEIVABLE AND ACCOUNTS PAYABLE

5.1 All accounts receivable for work performed up to the date of Closing are to be listed and attached as Exhibit E ("Accounts Receivable"), signed by the parties, and they shall be included as part of this transaction.  Any and all accounts payable accruing to and existing at the time of Closing ("Accounts Payable") are, and shall remain, the sole responsibility of the EMCT and are included as part of this transaction.

5.2 Any and all accounts receivable and payable, which shall accrue after Closing, shall be the sole property and obligation, respectively, of EMCT. Seller shall be required to settle all related paid funds to EMCT by customers at the Completion of Migration and/or Integration of Approved Assets.



Page 6                                                    Confidential

## ARTICLE 6 - PRORATIONS

All items of income or expense directly relating to the Target or the Assets which properly apply to periods commencing prior to the date of Closing and ending on or after the date of Closing shall be prorated between Seller and EMCT as of the close of business on the day prior to the date of Closing and again after the Completion of Migration and/or Integration of Approved Assets. There shall be no proration relating to the annual domain name registrations and transfers and SSL certificates or any other products sold that have hard costs that cannot be recovered by the Target. Items such as sub-domains, additional email accounts, additional bandwidth, hosting of domain names, data connections, collocation, and any other ancillary revenues generated from the Target other than annual domain name registrations and SSL certificates shall be subject to proration under this section.

## ARTICLE 7 - PREPAYMENTS AND DEPOSITS FROM CUSTOMERS

Any amounts received by Seller prior to Closing from customers as prepayments, excluding amounts received for domain name registrations and transfers and SSL certificates, or any other products sold that have hard costs that cannot be recovered by the Target, and including items such as sub-domains, additional email accounts, additional bandwidth, hosting of domain names, data connections, collocation, and any other ancillary revenues generated from hosting accounts other than annual domain name registrations and SSL certificates, for any undelivered and unused goods or services as of the date of Closing or held on deposit by Seller for the benefit of the Target's customers, whether by agreement or contract, oral or written, shall be transferred or credited to EMCT by Seller at Closing and at the Completion of Migration and/or Integration of Approved Assets. EMCT shall assume the full responsibility and pay all expenses of completing all services to be performed or products to be supplied by the Target pertaining to such prepayments and deposits. EMCT shall be entitled to all income there from when received.

## ARTICLE 8 - AUTHORIZATION: NO CONFLICTS

**8.1** The Target is not a party to, subject to or bound by any Law, and no Action is pending against the Target or, to the knowledge of the Seller, threatened that would prevent or adversely affect the execution, delivery or performance by the Seller of this Agreement and all other agreements herein contemplated or the transfer, conveyance and sale of the Stock or accompanying Corporate Assets pursuant to the terms hereof.

**8.2** This Agreement and any related agreements have been duly executed and delivered by the Seller and constitute the legally valid and binding obligation of the Seller, enforceable against the Seller in accordance with his terms except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws and equitable principles relating to or limiting creditors rights generally, subject to the unenforceability under certain circumstances of covenants not to compete.

**8.3** Neither the execution, delivery or performance of this Agreement or related agreements, nor the consummation of the transactions contemplated hereby, nor the fulfillment of the terms hereof, by the Seller violates or will violate, constitutes or will constitute a breach of or default under any of the terms and provisions of (whether upon lapse of time and/or the occurrence of any act or event or otherwise), or conflicts or will conflict with (a) any Contract (provided that no such representation is made with respect to Target's Contracts, Order or other material obligation to which the Target is a party or is bound, (b) any Law applicable to the Target or (c) the charter documents or bylaws of Target.

8.4 Neither the execution, delivery or performance of this Agreement or related agreements, nor the consummation of the transactions contemplated hereby, nor the fulfillment of the terms hereof, by the Seller results in or will result in (a) any augmentation or acceleration of rights, benefits or obligations of any party under any Contract or other material obligation to which the Target is a party or is bound or subject to or (b) the imposition of any Encumbrance against any Purchased Asset.

## ARTICLE 9 - FINANCIAL STATEMENTS: NO CHANGES, NO OTHER LIABILITIES OR CONTINGENCIES

9.1 The Seller has delivered to EMCT the Financial Statements, which have been prepared in accordance with GAAP, or an acceptable method of accounting agreed to by the parties. The income statements included in the Financial Statements present fairly in all material respects the operations of the Target for the period covered, and the balance sheets included in the Financial Statements present fairly in all material respects the financial condition of the Target as of the dates specified therein. Since the most recent fiscal year completed, there has been no change in any of the significant accounting policies, practices or procedures of Target.

9.2 Since December 18, 2008, whether or not in the ordinary course of business, there has not been, occurred or arisen:

(a) any change in or event affecting the Approved Assets or the Target that has had or may reasonably be expected to have a material adverse effect on the Approved Assets or the Target;

(b) any casualty, loss, damage or destruction (whether or not covered by insurance) of any Approved Assets that is material or has involved or may involve a Loss to the Target of more than $5,000;

(c) any payments, dividends or other distribution of assets or securities, whether consisting of cash, equity, other personal property, real property or other thing of value declared, issued or paid to or for the benefit of Stockholder not in the ordinary course of business except (i) as reflected in or disclosed in the Financial Statements or (ii) a distribution of cash to the Stockholder in an amount equal to the Taxes owed by Stockholder on behalf of Target as of the Closing Date

9.3 To the best knowledge of the Seller, there are no liabilities or obligations of any nature, whether accrued, absolute, contingent, or otherwise, and whether due or to become due, including, but not limited to: hosting, domain and control panel accounts and licenses fees, that relate to the Approved Assets or the Target, which, individually or in the aggregate, do not have, or are not reasonably likely to have a material adverse effect on the Approved Assets or the Target, except liabilities that

(a) are reflected on or disclosed in the Financial Statements,

(b) were incurred after December 18, 2008 in the ordinary course of business or

(c) are set forth in Section 1.4 of the Seller Disclosure Statement. To the knowledge of the Seller, the reserves reflected in the Financial Statements are adequate, appropriate and reasonable and have been calculated in a consistent manner.



 Confidential

## ARTICLE 10 - TAX AND OTHER RETURN REPORTS

**10.1** The Seller has timely filed or has caused to be filed or will file or will cause to be filed all Tax Returns required to be filed and have paid all Taxes required to be paid by the Target for all periods ending on or before the Closing Date. Adequate provision has been made in the books and records of the Target, and to the extent required by GAAP, or such accounting methods that are acceptable by the parties, in the Financial Statements, for all Taxes whether or not due and payable and whether or not disputed. The Seller has prepared all required Tax Returns, including amendments to date, in good faith without gross negligence or willful misrepresentation, and such Tax Returns are complete and accurate in all material respects and that no Governmental Entity has during the past three years, examined or is in the process of examining any Tax Returns of the Seller or proposed (tentatively or definitively), asserted or assessed or, to the best knowledge of the Seller, threatened to propose or assert, any deficiency, assessment or claim for Taxes and there would be no basis for any such delinquency assessment or claim.

**10.2** The Seller withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, shareholder or other third party.

**10.3** The Seller nor any director or officer (or employee responsible for Tax matters) of the Target reasonably expects any authority to assess any additional Taxes for any period for which Tax Returns have been filed. There is no dispute or claim concerning any Tax Liability of the Target either

    **(a)** claimed or raised by any authority in writing or,

    **(b)** as to which the Seller and the directors and officers (and employees responsible for Tax matters) of the Target have knowledge based upon personal contact with any agent of such authority.

**10.4** The Seller has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

**10.5** To the knowledge of each of the Seller, the unpaid Taxes of Target:

    **(a)** did not, as of the Most Recent Fiscal Month End, exceed the reserve for Tax Liability (rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the Most Recent Balance Sheet (rather than in any notes thereto) and

    **(b)** do not exceed that reserve as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of Target in filing Tax Returns.

**10.6** The Target is a party to any Tax allocation or sharing agreement. The Target,

    **(a)** has not been a member of an Affiliated Group filing a consolidated federal income Tax Return (other than a group the common parent of which were one or the other of the Target) or

    **(b)** have any Liability for the Taxes of any Person (other than the Target) under Reg. ss.1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract, or otherwise.

**emc**
TELECOM

## ARTICLE 11 - MATERIAL CONTRACTS

11.1 Each Material Contract, as defined in the <u>Assignment and Assumption Agreement</u> Exhibit F, was entered into in the ordinary course of business. True copies of the Material Contracts appearing in Assignment and Assumption Agreement, including all amendments and supplements, have been delivered to EMCT (other than any Contract assigned to and assumed by the Seller or his Affiliates in connection with the original sale of Approved Assets to Seller, if applicable, between a third-party. Each Material Contract is valid, binding and in full force and effect and is enforceable by Seller in accordance with its terms. The Seller has duly performed all of his obligations thereunder to the extent that such obligations to perform have accrued; and no breach or default, alleged breach or default, or event which would (with the passage of time, notice or both) constitute a breach or default thereunder by the Seller, or, to the best knowledge of the Seller, any other party or obligor with respect thereto, has occurred. The Seller has not received any notice of default or breach with respect to any Material Contract.

11.2 Target shall not do or agree to do any of the following: (1) Enter into any contract, commitment or transaction not in the usual and ordinary course of its business; (2) Enter into any contract, commitment, or transaction in the usual and ordinary course of business involving an amount exceeding Five Thousand dollars ($5,000.00); (3) Make any capital expenditure in excess of Five Thousand dollars ($5,000.00) or enter into any leases of equipment or property; (4) Sell or dispose of any capital assets with a net book value of Five Thousand dollars ($5,000.00).

## ARTICLE 12 - INTANGIBLE PROPERTY

As to each of the following items of or related to the target : (a) Hosting and Data service accounts (b) customer lists (c) goodwill in both (a) and (b) above (d) goodwill in the Hosting and Data Assets, (e) all rights in all Hosting and Data billing management software (f) all rights in any third-party product management and advertising accounts together with any accounts and access thereto held with any such third party that may include but is not limited to: Tucows, Enom, Internic, Google, Ubersmith, Telecom Carrier Extranets (g) all rights in any Control Panel Software or accounts (h) all rights in all Hosting and Data accounts (i) licenses, (j) phone numbers and associated accounts (k) post office boxes, (l) items shown in Exhibit "E" hereto and (m) any other accounts directly related to the Target, Target Online Business Presence and Offline Business Presence,  Seller hereby release, waive and/or transfer any and all such rights and information to and in favor of EMCT and hereby agree that Seller shall not make use of such information or accounts at any time after Closing. Seller specifically represents and warrants that the Intangible Property of the Seller transferred under this agreement is fully assignable free and clear of any Encumbrances. The Seller has not received any notice to the effect (or is otherwise aware) that any Intangible Property or any use by Seller of any such property conflicts with or allegedly conflicts with or infringes the rights of any Person, including, but not limited to staff, former staff, employees, independent contractors, agents, affiliates or partners of Target or Target.

## ARTICLE 13 - LEGAL PROCEEDINGS

There is no Order or Action pending, or, to the best knowledge of each of the Seller, threatened, against or affecting the Seller, the Approved Assets or the Target that individually or when aggregated with one or more other Orders or Actions has or might reasonably be expected to have a material adverse effect on the Approved Assets or the Target, on the Seller' ability to perform this Agreement or on any aspect of the transactions contemplated by this Agreement. The Seller Disclosure Statement lists each Order and each Action that involves a claim or potential claim of aggregate liability in excess of $5,000 against or that enjoins or seeks to enjoin any activity of the Seller. There is no matter as to which the Seller has received any notice, claim or assertion, or, to the best knowledge of the Seller, which otherwise has been threatened or is reasonably expected to be threatened or initiated, against or affecting any director, officer, employee, agent or representative of the Seller or any other Person,



                                    Confidential

nor to the best knowledge of the Seller is there any reasonable basis therefore, in connection with which any such Person has or may reasonably be expected to have any right to be indemnified by the Seller.

## ARTICLE 14 – INSURANCE

EMCT reserves the right to maintain all Assets in good condition and fully insured against General Liability, Property and Casualty, Errors and Omissions and Loss of Revenue. Additionally, EMCT acknowledges that Seller shall have the right, but is not required to carry insurance protection for fire, theft, burglary, and other hazards normally insured in the operation of the business of the Target. If such insurance coverage is acquired, the parties shall be named as loss payee on each others insurance policies during the terms of the Migration/Integration Period.

## ARTICLE 15 – APPROVALS AND PERMITS

**15.1** The Seller hold each Approval or Permit by or filing with any Governmental Entity or any Person not a party to this Agreement that is required to be made or obtained by the Seller in connection with the execution, delivery and performance of this Agreement or any related agreement or the consummation by the Seller of the transactions contemplated by this Agreement or any related agreement.

**15.2** The Seller hold all Permits that are required by any Governmental Entity to permit the conduct of the Business as now conducted, and all such Permits are valid and in full force and effect and will remain so upon consummation of the transactions contemplated by this Agreement or any related agreement. To the best knowledge of the Seller, no suspension, cancellation or termination of any of such Permits is threatened or imminent.

## ARTICLE 16 - COMPLIANCE WITH LAW

To the best knowledge of the Target, Seller, and all use of the Approved Assets are in compliance with all applicable Laws in all material respects; provided that with respect to compliance with applicable local, state and federal obscenity laws of the content of its customers hosted in the conduct of the Target, the Seller make no representation that they have conducted a reasonably diligent investigation and represent and warrant only that the Seller has received any notice or other indication from any Governmental Entity that the Seller is in violation of any applicable Law.

## ARTICLE 17 - EMPLOYEE MATTERS

Corporation has not entered into any written severance agreement or similar arrangement in respect of any present or former employee that will result in any obligation (absolute or contingent) of EMCT or the Target to make any payment to any present or former employee following termination of employment. No Employees shall have any rights to this transaction whatsoever. Seller agrees to indemnify and hold EMCT harmless from any actions arising out of any claim by any employee of Seller or Target.

## ARTICLE 18 – BROKERS OR FINDERS

All assumptions shall be that no agent, broker, finder, or investment or commercial banker, or other Person or firm engaged by or acting on behalf of the Seller or EMCT in connection with the negotiation, execution or performance of this Agreement or any related agreement



or the transactions contemplated by this Agreement or any related agreement, is or will be entitled to any brokerage or finder's or similar fee or other commission as a result of this Agreement or such transactions. If such agreements exist to either party, then those brokerage or finder's or similar fees or other commissions as a result of this transaction shall not affect this Agreement and either party engaged in such an agreement shall be responsible for their own brokerage or finder's or similar fees or other commissions outside of this Agreement.

### ARTICLE 19 - ACCURACY OF INFORMATION

None of the information supplied or to be supplied by or on behalf of the Seller (a) to any Person for inclusion in any document or application filed with any Governmental Entity having jurisdiction over or in connection with the transactions contemplated by this Agreement or any related agreement or (b) to EMCT, its agents or representatives in connection with these transactions, this Agreement or any related agreement or the negotiations leading up to this Agreement or any related agreement did contain, or at the respective times such information is or was delivered, will contain any untrue statement of a material fact, or omitted or will omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. If any of such information at any time subsequent to delivery and prior to Closing becomes untrue or misleading, in any material respect, the Seller will promptly notify EMCT in writing of such fact and the reason for such change. All documents required to be filed by the Seller with any Governmental Entity in connection with this Agreement or any related agreement or the transactions contemplated by this Agreement or any related agreement will comply in all material respects with the provisions of applicable Law.

### ARTICLE 20 – REPRESENTATIONS AND WARANTEES OF EMCT

#### 20.1 – ORGANIZATION AND RELATED MATTERS

EMCT is a Corporation duly organized, validly existing and in good standing under the laws of the State of Nevada. EMCT has all necessary corporate power and authority to carry on its business as now being conducted. EMCT has the necessary corporate power and authority to execute, deliver and perform this Agreement and any related agreements to which it is a party.

#### 20.2 – AUTHORIZATION

The execution, delivery and performance of this Agreement and any related agreements by EMCT has been duly and validly authorized by the board of directors of EMCT and by all other necessary corporate action on the part of EMCT. This Agreement constitutes the legal, valid and binding obligation of EMCT, enforceable against EMCT in accordance with its terms except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws and equitable principles relating to or limiting creditors' rights generally. Approval of EMCT's stockholder is not required to consummate the transactions contemplated by this Agreement.

#### 20.3 – NO CONFLICTS

The execution, delivery and performance of this Agreement and any related agreements by EMCT will not violate the provisions of, or constitute a breach or default (whether upon lapse of time and/or the occurrence of any act or event or otherwise) under (a) the charter documents or bylaws of EMCT, (b) any Law to which EMCT is subject to or bound, (c) any Contract to which EMCT is a party that is material to the financial condition, results of operations or conduct



of the business of EMCT, provided (as to clauses (b) and (c) respectively) that the appropriate Approvals are received and specified consents, if any, are secured. EMCT is not in material default under any Contract to which it is a party that would have

or might reasonably be expected to have a material adverse effect on EMCT's ability to consummate the transactions contemplated by this Agreement or any related agreements.

## 20.4 – BROKERS OR FINDERS

All assumptions shall be that no agent, broker, finder, or investment or commercial banker, or other Person or firm engaged by or acting on behalf of the Seller or EMCT in connection with the negotiation, execution or performance of this Agreement or any related agreement or the transactions contemplated by this Agreement or any related agreement, is or will be entitled to any brokerage or finder's or similar fee or other commission as a result of this Agreement or such transactions. If such agreements exist to either party, then those brokerage or finder's or similar fees or other commissions as a result of this transaction shall not affect this Agreement and either party engaged in such an agreement shall be responsible for their own brokerage or finder's or similar fees or other commissions outside of this Agreement.

## 20.6 – LEGAL PROCEEDINGS

There is no Order or Action pending or to the best knowledge of EMCT, threatened against or affecting EMCT that individually or when aggregated with one or more other Orders or Actions has or might reasonably be expected to have a material adverse effect on EMCT's ability to perform this Agreement or any other aspect of the transactions contemplated by this Agreement.

## 20.7 – BANKRUPTCY

EMCT is not presently subject to a Bankruptcy Event and does not presently contemplate filing a petition in Bankruptcy or for reorganization under the federal Bankruptcy Code, nor is EMCT aware of any threatened Bankruptcy Event against EMCT.

## ARTICLE 21 – UCC REQUIREMENTS

### 21.1 – UCC-1 SEARCH

EMCT reserves the right to employ an Escrow Agent to conduct a UCC-1 search to determine whether any recorded liens, except as set forth herein, are in existence against the Target or any of the Approved Assets prior to Closing. EMCT shall have the option to cause a lien search to be conducted in the territory wherein Target does business.

## ARTICLE 22 – ADDITIONAL AGREEMENTS

### 22.1 – NON-COMPETITION

At Closing, the parties shall enter into a Non-Competition Agreement, whereby Seller agree that they shall not, and will not, for a period of Two (2) consecutive years after Closing, directly or indirectly, engage in a competitive business with EMCT regarding the Target, provided that EMCT is not in default under any terms of this Agreement, unless otherwise agreed to by the parties and attached in business activities that do not compete with the Target being transferred to EMCT.



### 22.1.1) AUTHORIZED COMPETITION

EMCT shall allow Seller to conduct a resold business in competition with EMCT as long as such resold business shall be exclusively of EMCT products and services and if such authorized competition is conducted, EMCT reserves the right to audit the Seller to verify exclusivity is maintained in accordance with the terms and conditions of this Agreement. It is already stipulated that the Seller has an interest in doing such authorized competition and an addendum shall be attached to this Agreement upon agreement by the parties.

### 22.2 - Non-Disclosure

Neither the Seller nor any of his representatives will, at any time, make use of, divulge or otherwise disclose, directly or indirectly, any trade secret or other proprietary data (including, but not limited to, any customer list, record or financial information) concerning the Approved Assets or the Target that Seller or any representative of Seller may have learned as a shareholder, employee, officer or director of Seller. In addition, neither Seller nor any of his representatives will make use of, divulge or otherwise disclose, directly or indirectly, to persons other than EMCT, any confidential information concerning the Approved Assets or the Target which may have been learned in any such capacity. The only authorized communication to be sent to the customers and vendors and affiliates of the Target shall be regarding migration and integration related matters, including, but not limited to technical issues, such as domain and database adjustments, billing charges, credits, charge-back and refund issues, upgrades and promotions, license, hosting, domain and software account ownership transfer matters.

### 22.3 – Trademark Claims; Rights

Seller shall offer his cooperation and assistance where requested in the determination of any rights to the MYRIAD OR SECURITYMINDED TECHNOLOGIES names with respect to any third party claiming any right to such name. Seller is not now using and shall not in the future have any right to use the MYRIAD OR SECURITYMINDED TECHNOLOGIES names with respect to any entity existing now or in the future for any purpose. Seller is aware of no claim made with respect to the rights of any third party involving the MYRIAD OR SECURITYMINDED TECHNOLOGIES names or any other allegedly similar or derivative name. Seller represent that his first use of the MYRIAD OR SECURITYMINDED TECHNOLOGIES names in commerce was 03/21/03. As set forth herein Seller make no claim and hereby expressly abandon in favor of the Target any and all rights to use the MYRIAD OR SECURITYMINDED TECHNOLOGIES names.

### ARTICLE 23 – CONTINGENCIES

### 23.1 – SELLER' RESPONSIBILITY

Seller agree and acknowledge that it is the Seller' responsibility to determine the financial condition, creditworthiness and competency of EMCT.  Seller shall seek counsel in this determination to the extent of its desires.

### 23.2 – RIGHT OF INSPECTION

Upon execution of this agreement, EMCT, shall immediately have the right to inspect any and all items related to Target including, but not limited to, the Financial Information, Assets and Premises, in a manner which does not unreasonably interfere with the operation of Target. Seller shall, upon request, make available to EMCT all such items for EMCT's review. In the event that during such inspection, EMCT determines there are material discrepancies between Seller' representations and the actual status of these items, or that any of the items is unsatisfactory in EMCT's sole discretion, EMCT shall have the right to so notify Seller in writing of this determination. In such case, this

---



Confidential

Agreement shall immediately become null and void, all funds deposited into escrow shall be refunded to EMCT, and all parties shall be fully and completely released from all obligations hereunder except those set forth in Paragraph 7.2 herein.  If no such notice should be given by EMCT to Seller under this paragraph in advance of Closing the rights of EMCT under this paragraph shall be waived.

### 23.3 – REAL PROPERTY

No Real Property being transferred in this Agreement

### 23.4 – FINANCING

EMCT shall reserve the right to, at it sole discretion, acquire outside financing to complete any portion of this transaction. EMCT shall have the right to notify Seller in writing, if any such financing shall take place, and that any such financing that may affect any portion of Section 2 of this Agreement, such affect shall be addressed by the parties and any needed adjustments shall be determined by the parties in writing and attached in an addendum hereto.

## ARTICLE 24 – OBLIGATIONS PRIOR TO CLOSING

### 24.1 – NOTIFICATION OF CERTAIN MATTERS

From the Effective Date until the Closing, the Seller will give prompt notice to EMCT, and EMCT will give prompt notice to the Seller, of (a) the occurrence, or failure to occur, of any event that would be likely to cause any representation or warranty contained in this Agreement to be untrue or inaccurate in any material respect at any time from the date of this Agreement to the Closing Date and (b) any failure of EMCT or the Seller, as the case may be, to comply with or satisfy, in any material respect, any covenant, condition or agreement to be complied with or satisfied by it under this Agreement. This includes, but is not limited to: <u>delays for IP ranges</u> and other <u>Third-Party Data Center Services</u> or ARIN assignment necessary for operational setup of hosting and/or data customers for migration and/or integration to occur properly.

### 24.2 – CONDUCT OF BUSINESS PRIOR TO CLOSING DATE AND DURING CONSULTING PERIOD

From the Effective Date, the Closing and through his Consulting Period, the Seller will operate the Target or interact with customers that are being supported in any way, only in the ordinary course consistent with prudent industry practice and will use commercially reasonable efforts to preserve its relationship with and the goodwill of its customers, suppliers, employees and other Persons having business dealings in connection with the Target. The Seller will not, without the prior written consent of EMCT, which consent will not be unreasonably withheld:

**24.1** conduct the Target in any manner except in the ordinary course consistent with prudent industry practice;

**24.2** take any action or omit to take any action that would result in a breach or inaccuracy in any material respect of any of the representations and warranties set forth in this Agreement at or as of any time prior to the Closing;

**24.3** amend, terminate, renew (or fail to renew) or renegotiate any Material Contract;

**24.4** default (or take or omit to take any action that, with or without the giving of notice or passage of time, would constitute a default) in any of its obligations under any Material Contract or enter into any new Material Contract or take any action that would jeopardize the continuance of its material commercial relationships;

**24.5** terminate, amend or fail to renew any existing insurance coverage;

**24.6** terminate or fail to renew or preserve any Permits;

**24.7** incur or agree to incur any obligation or liability (absolute or contingent) that individually calls for payment by Target of more than $5,000 in any specific case or $10,000 in the aggregate;

**24.8** make any loan, guaranty or other extension of credit to or for the benefit of any director, officer, employee, shareholder or any of his respective Associates or Affiliates;

**24.9** grant any general or uniform increase in the rates of pay or benefits to officers, directors or employees (or a class thereof) or any material increase in salary or benefits of any officer, director, employee or agent or pay any special bonus to any Person, or enter into any new employment, collective bargaining or severance agreement;

**24.10** sell, transfer, mortgage, encumber or otherwise dispose of any Approved Assets, except (i) for dispositions of property not material in amount, (ii) in the ordinary course of business or (iii) as contemplated by this Agreement;

**24.11** issue, sell, redeem or acquire for value any debt obligations or Equity Securities of Seller;

**24.12** declare, issue, make or pay any dividend or other distribution of assets, whether consisting of money, other personal property, real property or other thing of value, to the Stockholder, except a distribution of cash to the Stockholder in an amount equal to the unpaid Taxes owed by Stockholder as of the Closing Date resulting from the operations of Seller prior to the Closing Date;

**24.13** directly or indirectly assign, transfer, mortgage, pledge, lease or otherwise dispose of or grant or create or permit to exist any Encumbrance on, the Approved Assets;

**24.14** fail to maintain the books and records relating to the Target in the usual, regular and ordinary manner, subject to the terms and conditions herein;

**24.15** change or amend its charter documents or bylaws in a manner that would frustrate Seller' ability to consummate the transactions contemplated by this Agreement;

**24.16** directly or indirectly purchase any real property;

**24.17** make any capital expenditures or commitments that individually calls for payment by Seller of more than $5,000 in any specific case or $10,000 in the aggregate;

**24.18** renew or initiate any new system or affiliate launches; notwithstanding the foregoing, Seller may renew or initiate any new system or affiliate launches if (i) such new system or affiliate launch has terms and conditions (both financial and otherwise) that are consistent with prudent industry practice and (ii) Seller promptly notify EMCT of such new system or affiliate launch;

**24.19** make special or extraordinary payments to any Person, including providing for, paying or otherwise satisfying trade payables or other obligations other than those that are currently due and payable, except a cash payment to the Stockholder in an amount equal to the unpaid Taxes owed by Stockholder as of the Closing Date resulting from the operations of Seller prior to the Closing;



                                    Confidential

**24.20** make any material investment, by purchase, contributions to capital, property transfers, or otherwise, in any other Person;

**24.21** dispose of or permit to lapse any rights to the use of any Intangible Property or dispose of or disclose any Intangible Property not a matter of public knowledge;

**24.22** compromise or otherwise settle any claims, or adjust any assertion or claim of a deficiency in Taxes (or interest thereon or penalties in connection therewith), or file any appeal from an asserted deficiency, except in a form previously approved by EMCT in writing, or file or amend any Tax Return, in any case before furnishing a copy to EMCT and affording EMCT an opportunity to consult with respect thereto;

### ARTICLE 25 - PRESERVATION OF BUSINESS PRIOR TO CLOSING DATE

From the Effective Date, the Closing, and through the Consulting Period (a) the Seller will use his reasonable best efforts to preserve the Approved Assets and the Target and to preserve the goodwill of customers, suppliers and others having business relations with Seller and (b) the Seller and EMCT will consult with each other concerning, and the Seller will cooperate to keep available to EMCT, the services of the officers and employees of Seller that EMCT may wish to offer employment.

### ARTICLE 26 - PERMITS AND APPROVALS

**26.1** The Seller and EMCT each agree to cooperate and use their reasonable best efforts to obtain (and will immediately prepare all registrations, filings and applications, requests and notices preliminary to all) Approvals and Permits that may be necessary or which may be reasonably requested by EMCT to consummate the transactions contemplated by this Agreement or any related agreements. This includes, but is not limited to: <u>delays for IP ranges</u> and other <u>Third-Party Data Center Services</u> or ARIN assignment necessary for operational setup of hosting and/or data customers for migration and/or integration to occur properly.

**26.2** To the extent that the Approval of a third party with respect to any Contract is required in connection with the transactions contemplated by this Agreement or any related agreements, the Seller will use his reasonable best efforts to obtain such Approval prior to the Closing Date and if any such Approval is not obtained, the Seller will cooperate with EMCT to ensure that EMCT obtains the benefits of each Contract. EMCT will reimburse the Seller for reasonable out of pocket expenses relating to the Seller' compliance with this Section 26.2. The Seller will jointly and severally indemnify and hold harmless (without limitation or duration) EMCT for and against any and all Losses as a result, directly or indirectly, of the failure to obtain any such Approval.

### ARTICLE 27 - EXCLUSIVITY

**27.1** From the Effective Date through the Closing, the Seller agree not to, and agree not to authorize or permit any of his Affiliates and the officers, directors, shareholders, employees, financial advisors or other representatives of Seller or his Affiliates to, enter into any agreement with respect to, furnish any information to any Person with respect to, or propose or take any other action to effect, or propose or take any other action that may reasonably be expected to

solicit, initiate, encourage or lead to an offer, proposal or indication of interest by any Person other than EMCT or its Affiliates with respect to:

**27.2** any merger or consolidation of Seller or his Affiliates with or into any Person other than EMCT or its Affiliates,

---



**27.3** any transfer of all or any portion of the Approved Assets to any Person other than EMCT or its Affiliates,

**27.4** any issuance or sale of any debt or Equity Securities of Seller to any Person other than EMCT or its Affiliates,

**27.5** the sale by any holder of any debt or Equity Securities of Seller to any Person other than EMCT or its Affiliates, or

**27.6** any other transaction the conclusion of which could reasonably be expected to impede, interfere with, prevent or materially delay the conclusion of the transactions contemplated hereby or could reasonably be expected to materially reduce the benefits to EMCT of the transactions contemplated hereby.

The terms of this Article 27 will be valid, binding, enforceable and irrevocable until this Agreement is terminated in accordance with its terms.

### ARTICLE 28 - SALES TAX

The parties agree to pay for each of their own respective sales or transfer taxes incurred in connection with this Agreement and the transactions contemplated herein.

### ARTICLE 29 - ITEMS TO BE DELIVERED BY THE SELLER PRIOR TO CLOSING

**29.1** a completed Seller Disclosure Statement

### ARTICLE 30 – CLOSING

**30.1 – OBLIGATIONS AT CLOSING**

**30.1.1 – ITEMS TO BE DELIVERED BY THE SELLER**

**30.1.2** a duly executed Bill of Sale; and

**30.1.3** a duly executed Assignment and Assumption Agreement; and

**30.1.4** ---omitted---

**30.1.5** a copy of all Target Books and Records; and

**30.1.6** such other instruments of sale; and

**30.1.7** such other consents of any Person as may be required for the consummation of the Closing.

**30.2 – ITEMS TO BE DELIVERED BY EMCT**

**30.2.1** The portion of the Purchase Price described in Section 2.2.2; and

### ARTICLE 31- CLOSING DATE

Upon the terms and subject to the conditions set forth in this Agreement, the Closing of the transactions contemplated by this Agreement will take place on the third Business Day after the

satisfaction or waiver of all of the conditions set forth in this Agreement, or at such other location or time as the Seller and EMCT may agree (the "Closing Date"). The parties will use their best efforts to satisfy all of the conditions set forth in this Agreement and promptly close the transactions contemplated in this Agreement.

## ARTICLE 32 – OBLIGATIONS AFTER CLOSING

### 32.1 –POST CLOSING ASSITANCE

Following Closing, Seller shall provide operational and technical assistance to EMCT for customer service issues and operational needs for a period of no longer than three-hundred and sixty-five (365) days ("Consulting Period"). This Operational and Technical assistance under this paragraph shall be provided at no charge to EMCT and shall be provided via telephone, email, or at the Target's place of business. Seller' availability for assistance related to emergency issues shall be 24/7. Seller's availability for non-emergency and customer service issues shall be during the normal business hours of the Target.

Upon the completion of consulting period and determination by EMCT that the location is fully capable of maintaining entire operations of customer accounts, then Seller shall not be required to provide assistance without compensation and shall be paid by a fair hourly rate determined by the parties.

## ARTICLE 33 – TERMINATION OF OBLIGATIONS

### 33.1 – TERMINATION OF AGREEMENT

Anything herein to the contrary notwithstanding, this Agreement and the transactions contemplated by this Agreement will terminate by mutual consent in writing of EMCT and the Seller at any time before the Closing or as follows (and in no other manner):

**33.1.1** By either EMCT or the Seller if there has been a material misrepresentation or material breach on the part of the other party in its representations, warranties or covenants set forth herein; provided, however, that if such breach or misrepresentation is susceptible to cure, the Seller or EMCT, as the case may be, will have thirty (30) Business Days after receipt of notice from the other party of its intention to terminate this Agreement pursuant to this paragraph in which to cure such breach or misrepresentation (if such misrepresentation or breach continues) before the other party may so terminate this Agreement.

**33.1.2** By EMCT upon written notice to Seller if any event occurs which would render impossible the satisfaction of one or more conditions to the obligation of EMCT to consummate the transactions contemplated by this Agreement;

**33.1.3** By the Seller upon written notice to EMCT if any event occurs which would render impossible the satisfaction of one or more conditions to the obligation of the Seller to consummate the transactions contemplated by this Agreement; or

**33.1.4** By either party to the agreement upon the mutual agreement of the parties.

### 33.2 – TERMINATION FOR SECURITY RISK TO CUSTOMERS OR UNLAWFULL ACTIVITY

**33.2.1** If EMCT determines that Target or Seller has intentionally placed any back door avails to the Approved Assets, including, but not limited to: Hidden SSH Keys, Bots, Scripts, Hacks, Viruses, Trojans, Port Scanners, Counterfeit (shell) Accounts, Fraudulent Billing Information, undisclosed Open Ports or User Accounts with Admin Privileges on Approved Assets that would create a security risk for the Customers of the Target and all other related to the Approved



Assets, or that would be deemed as any Internet Abuse or Illegal Activity under U.S. Law, or that would render Impossible the satisfaction of one or more conditions to the obligation of the EMCT to consummate the transactions contemplated by this Agreement; then, EMCT reserves the right to terminate the Agreement Immediately.

### 33.3 – EFFECT OF TERMINATION

If this Agreement is terminated pursuant to Section 33.1.4, all further obligations of the parties under this Agreement will terminate without further liability of any party to the other. All funds deposited into any escrow or paid to Seller shall be returned to EMCT in full. Responsibility for any escrow or other such service fees associated with this agreement shall be shared equally between the parties.

### ARTICLE 34 – INDEMNIFICATION; SURVIVAL

### 34.1 – INDEMNIFICATION BY SELLER

Seller agree to indemnify EMCT and its affiliates against any loss, cost, expense, damage or liability and attorney fees and other expenses Incurred in defending against litigation, either threatened or pending incurred or sustained by any one or more of them with respect to or arising out of (a) any breach of or misrepresentation of any warranty or representation made by Seller in or pursuant to this Agreement or failure by Seller to perform or comply with any covenant or agreement made by it In or pursuant to this Agreement, or (b) any liability of or claim against EMCT relating to any state of facts, event or omission existing or occurring prior to Closing. This Includes, but is not limited to: delays for IP ranges and other Third-Party Data Center Services necessary for operational setup of hosting for migration and integration to occur properly.

### 34.2 – INDEMNIFICATION BY EMCT

EMCT agrees to indemnify Seller, and his affiliates against any loss, cost, expense, damage or liability and attorney fees and other expenses Incurred in defending against litigation, either threatened or pending incurred or sustained by any one or more of them with respect to or arising out of (a) any breach of or misrepresentation of any warranty or representation made by EMCT In or pursuant to this Agreement or failure by EMCT to perform or comply with any covenant or agreement made by it In or pursuant to this Agreement, or (b) any liability of or claim against Seller relating to any state of facts, event or omission existing or occurring after Closing.

### 34.3 – WAIVER OF INDEMNIFICATION TO BROKER

Seller and EMCT, respectively, hereby acknowledge that any Broker or Finder that may be involved with this transaction, its officers, agents and employees, ("Staff"), have a right to rely upon and disclose to the other party any and all material facts, figures and related information disclosed by each of them, respectively, to Broker or Finder. Seller and EMCT, respectively, waive any and all rights, claims or causes of action each has or may otherwise have against Broker or Finder and/or Staff, for so relying upon and disclosing such facts, figures and information. Seller and EMCT,

respectively, agree to indemnify Broker or Finder and Staff, from and against any and all claims or causes of action, including damages, costs, expenses and attorneys fees incurred by Broker or Finder, and/or Staff arising out of said reliance upon and disclosure of such facts, figures and Information.

### 34.4 – SURVIVAL OF REPRESENTATIONS AND WARRANTIES



All representations and warranties contained in or made pursuant to this Agreement will survive the Closing until twelve (12) months after the Closing Date

### 34.5 – RIGHT OF SETOFF

If, and in the event, after Closing, EMCT receives written notice of a claim sought against Seller for any debt that was incurred or arose prior to Closing, EMCT shall promptly provide Seller written notification of such a claim. Seller shall have a period of ten (10) days to assume, discharge, or undertake in good faith the assumption or discharge, including the commencement of an appropriate action to dispute the validity, of such claim. In the event Seller fail to so assume, discharge or undertake the claim within the referenced time period, EMCT may elect to satisfy the obligation giving rise to such claim. In the event EMCT elects to so satisfy such a claim, EMCT shall have the right to receive a credit, in the amount paid to satisfy said claim, which credit, at EMCT's option, shall be applied either to the next unpaid principal amount, or the next due installments, of the Promissory Note, or against any other obligations due and owing in connection with the within transaction.

This Right of Setoff shall expire twelve (12) months after the Closing Date. The exercise or lack of exercise of any right under this paragraph shall not effect the rights that EMCT may have to recover the value of such claim and any fess, costs or expenses associated therewith as may otherwise be available under the law.

### ARTICLE 35 – DISPUTE RESOLUTION

### 35.1 – ALTERNATE DISPUTE RESOLUTION

Following the Closing, any dispute arising out of or relating to this Agreement will be resolved in accordance with the procedures specified in this Article 35, which will be the sole and exclusive procedures for the resolution of any such disputes, except this Article 35 will not apply to the following disputes, which will be litigated in a court of law:

**35.1.1** any dispute concerning the validity, ownership or control of the Target Marks;

**35.1.2** any claim asserted by one party against the other party arising out of the subject matter of any court litigation or proceeding commenced by any third party against one party in which the other party is an indispensable party or third party defendant; or

**35.1.3** any claim asserted by a third party, which is not bound and will not, upon request of either party, agree to arbitrate subject to the arbitration rules provided by this Article 35, against one party in which the other party is an indispensable or necessary party.

### 35.2 – NOTIFICATION AND NEGOTIATION

If either party wishes to assert a dispute with the other party arising out of or relating to this Agreement or any related agreements, such party will promptly notify the other party in writing of such dispute and will attempt in good faith to resolve any dispute arising out of or relating to this Agreement or any related agreements promptly by negotiation between executives who have authority to settle the controversy. All reasonable requests for information made by one party to the other will be honored.

### 35.3 – ARBITRATION

Except as otherwise expressly provided in this Agreement, or any related agreements, any controversy, dispute or claim under, arising out of, in connection with or in relation to this Agreement or any related agreements, including the negotiation, execution, interpretation, construction, coverage, scope, performance, non-performance, breach, termination, validity or



enforceability of this Agreement or any related agreements will be settled, at the request of either party, by arbitration conducted in accordance with this Article 35 and the then existing rules for commercial arbitration of the American Arbitration The arbitration will be governed by the Federal Arbitration Act (9 U.S.C. ss.ss. 1-16). The arbitration of such issues, including the determination of any amount of damages suffered by any party hereto by reason of the acts or omissions of either party, will be final and binding upon the parties to the maximum extent permitted by Law.

### 35.4 – RULES OF ARBITRATION

The arbitration will be conducted in accordance with rules of procedure adopted by the arbitrator to allow each of the parties to present evidence and argument to the arbitrators.

**35.4.1** Statute of Limitations. The statute of limitations of the State of California applicable to the commencement of a lawsuit will apply to the commencement of an arbitration hereunder,

except that no defenses will be available based upon the passage of time during any negotiation called for by the preceding paragraphs of this Article 35.

**35.4.2** Discovery; Rules of Evidence. Upon request of either party, the arbitrators will order such discovery (including third-party discovery) as the arbitrators determine to be reasonable under the circumstances. The arbitrators will, however, impose reasonable schedules and deadlines to ensure that discovery is conducted and concluded on a timely basis and may impose sanctions on either party for abuse or delay of discovery. Rules of civil procedure and evidence may be applied, in the discretion of the arbitrators.

**35.4.3** Expedited Procedure. Either party to the arbitration may elect, by notice to the other party, to have the arbitration conducted on an expedited basis. Thereafter, the arbitrators will be empowered to expedite the proceedings by all reasonable means consistent with a fair hearing of the dispute. Such means may include the imposing of accelerated discovery and hearing schedules, requiring submissions within abbreviated time periods and imposing limits on number of witnesses and the length of hearings.

**35.4.4** Decisions; Judgment. The arbitrator will in all cases as promptly as possible determine such matter. A determination and damage award (if any) of the arbitrator will be conclusive and binding upon the parties to the maximum extent permitted by law. The arbitrator will give written notice to the parties stating the determination and award (if any) and will furnish to each party a copy of such notice signed by the arbitrator. Judgment upon any award rendered by the arbitrator may be entered by any court having jurisdiction thereof.

### 35.5 – DAMAGES

Except as expressly provided below, the arbitrators are not empowered to award damages in excess of compensatory damages (e.g., consequential, incidental or special damages) and the Seller and EMCT each irrevocably waive any right to recover such damages with respect to any dispute resolved by arbitration. The arbitrators will have the authority to include, as an item of damages, the costs of arbitration, including reasonable legal fees and expenses, incurred by the prevailing party and to apportion such costs among the parties on a claim-by-claim basis as such party prevails thereon. For purposes of the foregoing, the "prevailing party" will mean the party whose final settlement offer (or other position or monetary claim) prior to the start of arbitration is

closest to the judgment awarded by the arbitrators, regardless of whether such judgment is entered into in favor of or against such party.

### 35.6 – FEES AND EXPENSES



Unless provided for in this Agreement, each party will bear its own expenses, including attorneys' fees, in connection with arbitration proceedings under this Article 35 the parties will share equally the expenses of the proceedings and the compensation of the arbitrator. Neither party in any such proceeding or any appeal thereon or challenge thereto will be entitled to attorneys' fees or court, arbitration and other costs or expenses incurred, unless otherwise decreed by the court or arbitrator in the same or a separate suit.

### 35.7 – CONFIDENTIAL NEGOTIATIONS AND PROCEEDINGS

All negotiations and proceedings pursuant to this Article 35 are confidential and will be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.

### 35.8 – SERVICE OF PROCESS

The Seller Parties and EMCT each agree that service by registered or certified mail, return receipt requested, or Federal Express or UPS mail with signature, delivered to such party at the address provided in Agreement will be deemed in every respect effective service of process upon such party for all purposes of these provisions relating to arbitration.

The Seller and EMCT each irrevocably submit to the jurisdiction of the courts of the State of California and to any federal court located within such state for the purpose of any action or judgment with respect to this Agreement, regardless of where any alleged breach

or other action, omission, fact or occurrence giving rise thereto occurred. The Seller and EMCT each hereby irrevocably waive any claim that any action or proceeding brought in California has been brought in any inconvenient forum.

## ARTICLE 36 – GENERAL

### 36.1 – GOVERNING LAW

This Agreement has been negotiated and entered into in the State of California and all questions with respect to this Agreement and the relationships of the parties hereunder will be governed by the internal laws of the State of California, regardless of the choice of law principles of California or any other jurisdiction.

### 36.1 – NO ASSIGNMENT; THIRD-PARTY BENEFICIARY

The provisions of this Agreement will be binding on and inure to the benefit of the successors of each party hereto; provided, that no party may agree to assign, transfer, pledge, hypothecate, charge or otherwise dispose of or subcontract any of its rights or obligations hereunder without the prior written consent of the other party, except that EMCT may so assign, etc. this Agreement to (a) an Affiliate if EMCT remains responsible and liable for such transferee's compliance with all of EMCT's obligations hereunder or (b) a third-party in connection with a merger, consolidation or sale of all or substantially all of EMCT's assets. Nothing in this Agreement, expressed or implied, is intended to confer on any Person other than the parties hereto or their respective permitted successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

### 36.2 – SEVERABILITY

If any provision of this Agreement is determined to be invalid, illegal or unenforceable by any Governmental Entity, the remaining provisions of this Agreement to the extent permitted by Law


will remain in full force and effect provided that the economic and legal substance of the transactions contemplated is not affected in any manner materially adverse to any party.

## 36.3 – PUBLIC ANNOUNCEMENTS

All media releases, public announcements and public disclosures regarding the transactions contemplated by this Agreement will be developed and drafted by EMCT and coordinated between and approved by the other parties before release (it being understood that while the parties will consult in good faith, they will not have approval rights over any announcement of the other party intended solely for internal distribution or any disclosure of the other party required by legal, accounting, or regulatory requirements). Such approval will not be unreasonably withheld, conditioned or delayed by any party. The parties will develop mutually acceptable guidelines for seeking confidential treatment of terms of this Agreement deemed highly sensitive by any party. The parties will develop a mutually acceptable press release concerning the subject matter of this Agreement to be released promptly following Closing. This Section 36.3 will survive the completion, expiration, termination or cancellation of this Agreement.

## 36.4 – CONFIDENTIALITY

**36.4.1** All information disclosed by any party (or its representatives) whether before or after the Effective Date, in connection with the transactions contemplated by, or the discussions and negotiations preceding, this Agreement to any other party (or its representatives) will be kept confidential by such other party and its representatives and will not be used by

any such Persons other than as contemplated by this Agreement, except to the extent that such information (a) was known by the recipient when received, (b) is or hereafter becomes lawfully obtainable from other sources, which have an independent right to such information, (c) is generally available to the public or becomes generally available to the public other than through disclosure in violation of this provision and only after the date such information is generally available to the public, (d) which is required to be disclosed by a Governmental Entity having jurisdiction over the parties or applicable law; provided that the disclosing party notifies the other party as promptly as reasonably practicable following receipt of notice from a Governmental Entity, (e) is disclosed to each party's auditors and financial and legal advisors who have been advised of their obligation to maintain the information in confidence, (f) may be disclosed pursuant to a written waiver by the other party or (g) is deemed necessary by the Seller in his reasonable business judgment to negotiate and consummate Internet related business dealings, provided that (i) the Seller do not reveal any financial information relating to EMCT or its Affiliates, this Agreement or any related agreement, (ii) *****omitted*****, and (iii) prior to disclosure, the recipient enters into a written confidentiality agreement with the Seller acceptable to EMCT and which gives EMCT the right as a third party beneficiary to enforce its terms.

**36.4.2** In recognition of each party's understanding that the other may in the future invite third parties to participate as equity or non-equity investors or other providers of financing in or to such party or its respective affiliates, the parties agree that each may provide to such entities copies of this Agreement and such other information as would be reasonable in the circumstances for a potential investor to require. Notwithstanding the foregoing, no such information will be provided until a confidentiality agreement for the benefit of the other party and their respective affiliates has been signed by such potential investor.

**36.4.3** This Agreement and the exhibits attached hereto contain the entire agreement of the parties with respect to the subject matter of this Agreement, and supersede all prior negotiations,

agreements and understandings with respect thereto. This Agreement may only be amended by a written document duly executed by all parties.



Confidential

**36.4.4** If this Agreement is terminated in accordance with its terms, each party will use all reasonable efforts to return upon written request from the other party all documents (and reproductions thereof) received by it or its representatives from such other party (and, in the case of reproductions, all such reproductions made by the receiving party) that include Information not

within the exceptions contained in this Section 15.4, unless the recipients provide assurances reasonably satisfactory to the requesting party that such documents have been destroyed.

**36.5 – NOTICES**

All notices, requests, demands and other communications required to be given under this Agreement will be in writing and will conclusively deemed to have been duly given (or to such other address, or facsimile transmission number as the relevant addressee may hereafter by notice hereunder substitute): (a) when hand delivered to the other party, (b) the next Business Day, if sent by a generally recognized overnight courier service that provides written acknowledgment by the addressee of receipt, or (c) when received, if sent by facsimile or other generally accepted means of electronic transmission (including e-mail); provided that such facsimile or other generally accepted means of electronic transmission is followed by a delivery pursuant to clauses (a) or (b) above, FedEx, DHL or United Postal Service ("UPS").

| To Seller: | UV2, Inc.<br>Attention: David E Szostek<br>648 Monroe Avenue NW, Suite B007<br>Grand Rapids, Michigan 49503<br>Facsimile: (616) 723-0099 |
| --- | --- |
| With a copy to: | Clark Hill PLC<br>Attention: Jeffrey A DeVree<br>200 Ottawa Avenue NW, Suite 500<br>Grand Rapids, Michigan 49503<br>Facsimile: (616) 608-1199 |
| To Buyer: | EMC TELECOM CORPORATION<br>4904 South Power Road, Suite 103<br>Mesa, Arizona 85212<br>Signature Only: Erik Zeiner or Marcos Arce<br>Facsimile: (866) 871 -6893 |
| With a copy to: | McDermott Will & Emery LLP<br>2049 Century Park East, Suite 3800<br>Los Angeles, California 90067<br>Attention: Gary B. Gertler<br>Facsimile: (310) 277-4730 |

**36.7 – SPECIFIC PERFORMANCE**

The Seller and EMCT acknowledge that, in view of the uniqueness of the Target and the transactions contemplated by this Agreement, each party would not have an adequate remedy at

 **emc** TELECOM

Confidential

law for money damages if this Agreement has not been performed in accordance with its terms, and therefore agrees that the other party will be entitled to specific enforcement of the terms hereof in addition to any other remedy to which it may be entitled, at law or in equity.

ABOVE CONDITIONS ARE HEREBY APPROVED AND ACCEPTED:

EMC TELECOM CORPORATION:

_____

Erik Zelner, Secretary/GM
EMC TELECOM CORPORATION
4904 S POWER RD
Suite #103-147
Mesa, AZ 85212

Date: Thursday, December 18, 2008

88-0434956
_____
EIN

**SELLER'S ACCEPTANCE**

WE ACCEPT the foregoing offer and agree to sell the above described business and assets on the terms and conditions of the foregoing Asset Purchase Agreement.

DATED and ACCEPTED on this the Thursday, December 18, 2008.

Seller: UV2, Inc.

Stockholder: David Szostek

Signature: _____

Seller EIN: 20-2000488

Target Address: 648 Monroe Avenue NW, Suite B007, Grand Rapids, Michigan 49503

---

EMCT/UVH                          Asset Purchase Agreement

 **TELECOM**

Confidential

## EXHIBITS AND SCHEDULES

**EXHIBIT LISTING**

A.      Definitions
B.      End User Agreements (Customer Contracts)
C.      Included Property of Seller (Approved Assets)
D.      Bill of Sale
E.      Accounts Receivable Listing
F.      Assigned Agreement Listing (Vendor Contract List)
G.      Seller's Disclosure Statement

**EXHIBIT A – DEFINITIONS**

A. For all purposes of this Agreement, except as otherwise expressly provided,

(i) the terms defined in this Exhibit A have the meanings assigned to them in this Exhibit A and include the plural as well as the singular,

(ii) all accounting terms not otherwise defined herein have the meanings assigned under GAAP,

(iii) all references in this Agreement to designated "Articles" and "Sections" and other subdivisions are to the designated Sections and other subdivisions of the body of this Agreement,

(iv) pronouns of either gender or neuter will include, as appropriate, the other pronoun forms,

(v) "including," and "includes" will be deemed to be followed by "but not limited to" and "but is not limited to," respectively,

(vi) "or" is not exclusive,  (vii) "amended" with reference to a Contract or Law, will be deemed to be followed by "or superseded from time to time", and

(vii) the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Section or other subdivision.

B. As used in this Agreement and the exhibits and schedules delivered pursuant to this Agreement, the following definitions will apply:

"Action" means any action, complaint, petition, investigation, suit or other proceeding, whether civil or criminal, in law or in equity, or before any arbitrator or Governmental Entity.

"Affiliate" with respect to any party means any Person controlled by, controlling, or under common control with such party. The term "control" means the right or power to direct the management or policies of a Person, whether by ownership of stock, by contract or otherwise, and the words "controlled" and "controlling" have the correlative meanings.

"Agreement" means this Agreement by and among EMCT and the Seller, as amended together with all exhibits and schedules attached or incorporated by reference.

"Approval" means any approval, authorization, consent, qualification or registration, or any waiver of any of the foregoing, required to be obtained from, or any notice, statement or other communication required to be filed with or delivered to, any Governmental Entity or any other Person.

"Associate" of a Person means

(i) a Corporation or organization (other than EMCT or Seller or any of their respective Affiliates) of which such Person is an officer or partner or is, directly or indirectly, the beneficial owner of 10% or more of any class of equity securities;

(ii) any trust or other estate in which such Person has a substantial beneficial interest or as to which such Person serves as trustee or in a similar capacity; and

(iii) any relative or spouse of such Person or any relative of such spouse who has the same home as such Person or who is a director or officer of Seller or any of his respective Affiliates.

"Assumed Liabilities" has the meaning set forth in Section 4.1.

"Bankruptcy Event" means (a) the filing of an application by a Person for, or such Person's consent to, the appoint of a trustee, receiver or custodian of such Person's assets, (b) the entry of an order for relief with respect to a Person in proceedings under the United States Bankruptcy Code, as amended, (c) the making by a Person of a general assignment for the benefit of creditors, (d) the entry of an order, judgment or decree by any court of competent jurisdiction appointing a trustee, receiver or custodian of the assets of a Person unless the proceedings and the trustee, receiver or custodian appointed are dismissed within 90 days, or (e) the failure by a Person generally to pay such party's debts as the debts become due within the meaning of Section 303(h)(1) of the United States Bankruptcy Code, as determined by the Bankruptcy Court, or the admission in writing of such Person's inability to generally pay its debts as they become due.

"Business Day" means any day other than a Saturday, Sunday or legal holiday under the laws of the State of California or any other day on which banking institutions located in such state are authorized or required by law or other governmental action to close.

"Closing" means the consummation of the purchase and sale of the Approved Assets under this Agreement.

"Closing Date" means the date of the Closing.

"COBRA" means the continuing coverage obligations under Code Section 4980B and Sections 601-608 of ERISA, as amended, and the related regulations and published interpretations.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any agreement, arrangement, bond, commitment, franchise, indemnity, indenture, instrument, lease, license or understanding, whether or not in writing.

"Data Services" means any bandwidth service, including, but not limited to: Digital Subscriber Line ("DSL"), Fiber Connection, or any wire-line or wireless connection solution provided to customers, this also includes networking solutions, such as on-site or off-site firewall management and other similar network security or monitoring solutions provided to customers.

"Encumbrance" means any claim, charge, easement, encumbrance, lease, covenant, condition, security interest, lien, option, pledge, rights of others (including, but not limited to, marital property rights), or restriction (whether on voting, sale, transfer, disposition or otherwise), whether imposed by Contract, understanding, law, equity or otherwise, except for any restrictions on transfer generally arising under any applicable federal or state securities law.

"Equity Securities" means any capital stock or other equity interest or any securities convertible into or exchangeable for capital stock or any other rights, warrants or options to acquire any of the foregoing securities.



Confidential

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the related regulations and published interpretations.

"Event of Default" means any of the following events that remain uncured at the time Seller exercise remedies with respect to such events: (a) EMCT fails to make any cash payment due to Seller under the terms of this Agreement within 180 days following the date the cash payment is due; (b) EMCT defaults on the payment of Indebtedness owed to senior secured lenders and such senior secured lenders either commence foreclosure on EMCT assets pledged to secure such indebtedness or accelerate the amounts due under the contracts and/or instruments evidencing such indebtedness and EMCT fails to provide Seller with reasonable financial assurances that it will continue to make all scheduled payments in accordance with Article 2; or (c) EMCT becomes subject to a Bankruptcy Event.

"Excluded Assets" has the meaning set forth in Section 3.3.

"Excluded Liabilities" has the meaning set forth in Section 4.2.

"Financial Statements" means the income statements for all of the years prior to the most recent fiscal year completed, and all the months of the current fiscal year and the balance sheets.

"GAAP" means generally accepted accounting principles in the United States, as in effect from time to time.

"Governmental Entity" means any government or any agency, bureau, board, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"Indemnifiable Claim" means any Loss for or against which any party is entitled to indemnification under this Agreement. "Indemnified Party" means the party entitled to indemnity hereunder. "Indemnifying Party" means the party obligated to provide indemnification hereunder.

"Intangible Property" means any trade secret, secret process or other confidential information or know-how and any and all Marks and goodwill.

"Internet" means the global information system that (a) is logically linked together by a globally unique address space based on the Internet Protocol (IP) or its subsequent extensions/follow-ons, (b) is able to support communications using the Transmission Control Protocol/Internet Protocol (TCP/IP) suite or its subsequent extensions/follow-ons, and/or other IP-compatible protocols, and (c) provides, uses or makes accessible, either publicly or privately, high level services layered on the communications and related infrastructure described herein.

"IRS" means the Internal Revenue Service or any successor entity.

"Largest Customer" means the largest revenue-generating customer of Target at the closing date of this Agreement.

"Law" means any constitutional provision, statute or other law, rule, regulation, or interpretation of any Governmental Entity and any Order.

"Loss" means any action, cost, damage, disbursement, expense, liability, loss, deficiency, diminution in value, obligation, penalty or settlement of any kind or nature, whether foreseeable or unforeseeable, including interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses incurred in the investigation, collection, prosecution and defense of claims and amounts paid in settlement, that may be imposed on or otherwise incurred or suffered by the specified Person.



"Mark" means any brand name, copyright, patent, service mark, trademark, trade name, logo or similar materials and all registrations or application for registration of any of the foregoing.

"Material Contract" means any Contract material to the Approved Assets or the Target to which any of the Seller is a party or to which any of the Seller or any of his respective properties (including the Approved Assets) is subject or bound as of or after the Effective Date including any Contract that (a) after the most recently completed fiscal year that obligates Seller to pay or receive an amount of $50,000 or more, (b) has a term twelve (12) months beyond the last fiscal year completed, (c) represents a Contract upon which the Business is substantially dependent or which is otherwise material to the Target, (d) provides for the extension of credit, (e) limits or restricts the ability of Seller to compete, (f) limits or restricts the ability of Seller to operate the Target, (g) provides for a guaranty or indemnity by Seller, (h) grants a power of attorney, agency or similar authority to another Person, (i) contains a right of first refusal, (j) contains a right or obligation of Seller other than in the ordinary course of business to any Affiliate, officer or director or any Associate of Seller, (k) is a real property lease, or (l) was not made in the ordinary course of business.

"Media" means all current forms of television distribution, broadcast, transmission, retransmission, display, exploitation, projection, performance or other exhibition whether on a subscription, Pay-Per-View or free basis, including the following: (a) conventional VHF or UHF television broadcast, (b) Basic Cable and pay cable whether by means of cable wire or fiber of any material, (c) "over the air pay" subscription television (STV) in any frequency band, (d) direct broadcasting by satellite (DBS) in any frequency band, (e) master antenna television systems (MATV), (f) multipoint distribution services (MDS), (g) multichannel multipoint distribution services (MMDS), (h) satellite master antenna television systems (SMATV), (i) microwave transmission, and (j) any other means of transmitting programming to Television-Based Viewing Devices. Notwithstanding the foregoing, if any current form of television distribution, broadcast, transmission, retransmission, display, exploitation, projection, performance or other exhibition is augmented by a level of functionality that does not alter the fundamental means in which the viewer receives images and/or text, such form of television distribution, broadcast, transmission, retransmission, display, exploitation, projection, performance or other exhibition will continue to be deemed "Media" for the purposes of this Agreement.

"Migration and/or Integration Completion" means ALL of Approved Assets listed in Exhibit C of this Agreement are in the possession of EMCT, with complete and FULL control over EVERY aspect of the Approved Assets, including, but not limited to: the ability to update and secure under EMCT, any domain name registration of service domains, software accounts, hosting accounts, domains registration accounts, control panel accounts, bandwidth wire-line and wireless accounts, customer account information, customer credit card and check billing information management, and payment gateways, with the Seller's control being REMOVED from ALL of the Approved Assets with no contingencies or "back door" avails left in place for Seller.

"Order" means any decree, injunction, judgment, order, ruling, assessment or writ.

"Person" means an association, a Corporation, a limited liability company, an individual, a partnership, a trust or any other entity or organization, including a Governmental Entity. "Approved Assets" has the meaning set forth in Article 2.

"Shares" means all authorized capital stock of Target.

"Seller Disclosure Statement" means the Disclosure Statement delivered by Seller to EMCT and attached hereto. Seller will use his best efforts to have all required disclosures correspond to the applicable Section of this Agreement; provided, however, that information included in any Section of the Disclosure Statement will be deemed to be included in each other Section of the Disclosure Statement to the extent that the applicability of the information to that other Section is reasonably apparent on the face of such disclosure.

---



"Stock" means all authorized capital stock of Target.

"Target" means UV Hosting, LLC, the owner of all of the Approved Assets listed in Exhibit C, which may include, but is not limited to: receivables, cash reserves, credit lines, bank accounts, equity interest, web hosting accounts, domain names, email accounts, SSLs, web development accounts, reseller accounts, Data Services accounts, material contracts, real property, phone numbers, employees, intangible property, patents furniture, fixtures and equipment relating in any way to the operations of the http://www.UVHOSTING.com website. Any other existing businesses the Target may own or operate including but not limited to UV Backups and UV Uptime, shall be considered part of the Excluded Assets, unless they are listed in Exhibit C.

"Tax" or "Taxes" means (a) any foreign, federal, state, county or local income, sales and use, excise, franchise, real and personal property, transfer, gross receipt, capital stock, production, business and occupation, disability, employment, payroll, severance or withholding tax, ad valorem, alternative or add-on minimum, customs duties, environmental (including taxes under Code ss.59A), escheat, estimated tax, lease, license, occupation, premium, profits, service, social security (or similar), stamp, value added, windfall profits, any charge imposed by any Governmental Entity, or any other taxes, fees, assessments or charges of any kind whatsoever, including any interest and penalties (civil or criminal), or additions to tax or additional amounts with respect thereto, whether disputed or not, or to the nonpayment thereof, and any Loss in connection with the determination, settlement or litigation of any Tax liability; (b) any liability for payment of amounts described in clause (a) above whether as a result of transferee liability, of being a member of an affiliated, consolidated, combined, or unitary group for any period, or otherwise through operation of law; and (c) any liability for the payment of amounts described in clauses (a) or (b) above as a result of any tax sharing, tax indemnity, or tax allocation agreement or any other express or implied agreement to indemnify any other Person.

"Tax Return" means a report, return or other information required to be supplied to a Governmental Entity with respect to Taxes including, where permitted or required, combined or consolidated returns for any group of Persons that includes Seller and any amendments thereto.

"Territory" means the United States, Canada or any other country of operation (and their territories and possessions).

"Total Down Payment" means the total cash United States dollar amount that will be paid at the Closing Date.

**emc**
TELECOM
Page 31                                Confidential

## EXHIBIT B – END-USER AGREEMENTS

(Please include a FULL Exported list of Customer Account Data)

3 hosting contracts. See exhibit F-1.

      Customers : DV
               VMM
               INV

**emc**
TELECOM

Confidential

## EXHIBIT C – APPROVED ASSETS

(Please include a FULL Detailed list of all Approved Assets)

See attached, called "exhibit C"

---

# Exhibit C

2x   APC Switched Rack PDU – 30 Amp
       Model # AP7932
       http://www.apc.com/resource/include/techspec_index.cfm?base_sku=AP7932

Visible label:  bm1-XXXXX
Chassis:       supermicro mini 1U SC512L-260B
CPU:   Intel Core2 Duo E4500
HD1:   WD 160G SATA-II - WD1600JSRTL
HD2:   WD 160G SATA-II - WD1600JSRTL
HW warranty expiration:   4/11/2009
Mobo Type / Model:  Foxconn 946GZ7MA desktop board
NIC Type:      on-board nVidia 100/10 NIC
Power Supply:      1U 260-watt power
RAID Type (level, hw/sw):   none
RAM (amount, type): 1-Gig DDR2-667
SW type:     Windows 2003 32-bit


Object type:  Server
Asset tag:    2731
Visible label:  bg1-XXXXX
Chassis:      SuperMicro SC811T-260 1U Rack-mount Chassis
CPU:   AMD Athlon 64 3400+, 128K L1, 512K L2, 400mhz FSB
HD1:   160GB SATA
HD2:   160GB SATA
Mobo Type / Model:  Gigabyte GA-K8VM800M Main Board, VIA K8M800 Chipset
NIC Type:     on-board VIA 100/10 NIC
Power Supply:      SuperMicro 260watt 1U Power Supply
RAID Type (level, hw/sw):   RAID1 - Software
RAM (amount, type): 2048M DDR-400 PC-3200 (2x 1G, 0x open)
SW type:     CentOS 4 - 32 bit


Object type:  Server
Asset tag:    2727
Visible label:  utility1-XXXXX
Chassis:      SuperMicro SC811T-260 1U Rack-mount Chassis
CPU:   Intel Core2 Duo E6600
HD1:   160GB SATA
HD2:   160GB SATA
Mobo Type / Model:  SM PDSMI+ server board
NIC Type:     2x onboard GigE Copper NIC
Power Supply:      SuperMicro 260watt 1U Power Supply
RAID Type (level, hw/sw):   RAID1 - Software
RAM (amount, type): 2x Kingston 1G DDR2-667
SW type:     CentOS 4 - 32 bit


Object type:  Server
Asset tag:    2728
Visible label:  fms-XXXXX
Chassis:      SuperMicro SC811T-260B 1U Rack-mount Chassis, Black

CPU:   Intel Core2 Duo E6600, 2x 2.4G/2M L2 cores
HD1:   Western Digital Caviar SE16 WD3200AAKS 320GB 7200 RPM 16MB Cache
SATA 3.0Gb - WD3200AAKS
HD2:   Western Digital Caviar SE16 WD3200AAKS 320GB 7200 RPM 16MB Cache
SATA 3.0Gb - WD3200AAKS
Mobo Type / Model:  Supermicro PDSMI+ server board, Intel 3000 chipset
NIC Type:      on-board Intel dual-port gigabit NICs
Power Supply:       supermicro 1U 260w Power Supply
RAID Type (level, hw/sw):   RAID1 - Software
RAM (amount, type): 4-Gig (2x 2G) DDR2-533 installed, 2x open, 8G max.
SW type:      CentOS 4 - 32 bit
Software License Included: Flash Media Server 2 (assuming license transfer allowed
under software provider's EULA)


Object type:  Server
Asset tag:    2730
Visible label:  fs1-XXXXX
Chassis:      Dell PowerEdge 2850
CPU:  Dual Xeon 3.2 GHz CPUs with 2MB cache
HD1:   300GB SCSI U320 10K RPM - ST3300007LC
HD2:   300GB SCSI U320 10K RPM - ST3300007LC
HD3:   300GB SCSI U320 10K RPM - ST3300007LC
HD4:   300GB SCSI U320 10K RPM - ST3300007LC
HD5:   300GB SCSI U320 10K RPM - ST3300007LC
HD6:   300GB SCSI U320 10K RPM - ST3300007LC
NIC Type:      2x onboard GigE Copper NIC
Power Supply:       Redundant Power Supplies
RAID Type (level, hw/sw):   RAID 5 - Hardware
RAM (amount, type): 8GB - 4x2GB Samsung DDR2 ECC Registered memory modules
for PE2850
SW type:      CentOS 4 - 64 bit


Object type:  Server
Asset tag:    2729
Visible label:  fs2-XXXXX
Chassis:      Dell PowerEdge 2850
CPU:  Dual Xeon 3.2 GHz CPUs with 2MB cache
HD1:   300GB SCSI U320 10K RPM - ST3300007LC
HD2:   300GB SCSI U320 10K RPM - ST3300007LC
HD3:   300GB SCSI U320 10K RPM - ST3300007LC
HD4:   300GB SCSI U320 10K RPM - ST3300007LC
HD5:   300GB SCSI U320 10K RPM - ST3300007LC
HD6:   300GB SCSI U320 10K RPM - ST3300007LC
NIC Type:      2x onboard GigE Copper NIC
Power Supply:       Redundant Power Supplies
RAID Type (level, hw/sw):   RAID 5 - Hardware
RAM (amount, type): 8GB - 4x2GB Samsung DDR2 ECC Registered memory modules
for PE2850
SW type:      CentOS 4 - 64 bit


Object type:  Load balancer
Visible label:  lb1

Chassis:      F5 Networks – BIG IP gigabit fiber

Object type:  Load balancer
Visible label:  lb2
Chassis:      F5 Networks – BIG IP gigabit fiber
Visible label:  sw1
OEM S/N 1:    CAT0919R1M4
SW version:   12.2(25)SE
HW type:      Cisco Catalyst 3750G-12S
SW type:      Cisco IOS 12.2

Object type:  network switch
Asset tag:    2710
Visible label:  sw2
OEM S/N 1:    CAT0912Z064
SW version:   12.2(25)SE
HW type:      Cisco Catalyst 3750G-12S
SW type:      Cisco IOS 12.2

Object type:  network switch
Asset tag:    2712
Visible label:  sw4
OEM S/N 1:    CAT0850Z2V2
SW version:   12.1(22)EA1a
HW type:      Cisco Catalyst 3550-24
SW type:      Cisco IOS 12.1

Object type:  Server
Asset tag:    2720
Visible label:  web1-XXXXX
Chassis:      SuperMicro SC811T-260 1U Rack-mount Chassis
CPU:   AMD Athlon 64 3400+, 128K L1, 512K L2, 400mhz FSB
HD1:   160GB SATA
HD2:   160GB SATA
Mobo Type / Model:  Gigabyte GA-K8VM800M Main Board, VIA K8M800 Chipset
NIC Type:     on-board nVidia 100/10 NIC
Power Supply:      SuperMicro 260watt 1U Power Supply
RAID Type (level, hw/sw):   RAID 1 – Software (OS partition) / RAID 0 – Software (data partition)
RAM (amount, type): 2048M DDR-400 PC-3200 (2x 1G, 0x open)
SW type:      CentOS 4 – 64 bit

Object type:   Server
Asset tag:     2719
Visible label: web1-XXXXX
Chassis:       SuperMicro SC811T-260 1U Rack-mount Chassis
CPU:   Intel Core 2 Quad Q6600
HD1:   160GB SATA
HD2:   160GB SATA
Mobo Type / Model:  SM PDSMI+ server board
NIC Type:      2x onboard GigE Copper NIC
Power Supply:        1U 260-watt power
RAID Type (level, hw/sw):   RAID 1 - Software
RAM (amount, type): 2x Kingston 1G DDR2-667
SW type:       CentOS 3 - 32 bit & Plesk 7.5.4
Software License Included: Plesk owned license (assuming license transfer allowed
under software provider's EULA)

Object type:   Server
Asset tag:     2721
Visible label: web2-XXXXX
Chassis:       SuperMicro SC811T-260 1U Rack-mount Chassis
CPU:   AMD Athlon 64 3400+, 128K L1, 512K L2, 400mhz FSB
HD1:   160GB SATA
HD2:   160GB SATA
Mobo Type / Model:  Gigabyte GA-K8VM800M Main Board, VIA K8M800 Chipset
NIC Type:      on-board VIA 100/10 NIC
Power Supply:       SuperMicro 260watt 1U Power Supply
RAID Type (level, hw/sw):   RAID 1 - Software (OS partition) / RAID 0 - Software
(data partition)
RAM (amount, type): 2048M DDR-400 PC-3200 (2x 1G, 0x open)
SW type:       CentOS 4 - 64 bit

Object type:   Server
Asset tag:     2722
Visible label: web3-XXXXX
Chassis:       SuperMicro SC811T-260 1U Rack-mount Chassis
CPU:   AMD Athlon 64 3400+, 128K L1, 512K L2, 400mhz FSB
HD1:   160GB SATA
HD2:   160GB SATA
Mobo Type / Model:  Gigabyte GA-K8VM800M Main Board, VIA K8M800 Chipset
NIC Type:      on-board VIA 100/10 NIC
Power Supply:       SuperMicro 260watt 1U Power Supply
RAID Type (level, hw/sw):   RAID 1 - Software (OS partition) / RAID 0 - Software
(data partition)
RAM (amount, type): 2048M DDR-400 PC-3200 (2x 1G, 0x open)
SW type:       CentOS 4 - 64 bit

Object type:   Server
Asset tag:     2723
Visible label: web4-XXXXX
Chassis:       SuperMicro SC811T-260 1U Rack-mount Chassis
CPU:   AMD Athlon 64 3400+, 128K L1, 512K L2, 400mhz FSB
HD1:   160GB SATA
HD2:   160GB SATA

Mobo Type / Model:  Gigabyte GA-K8VM800M Main Board, VIA K8M800 Chipset
NIC Type:      on-board VIA 100/10 NIC
Power Supply:       SuperMicro 260watt 1U Power Supply
RAID Type (level, hw/sw):   RAID 1 - Software (OS partition) / RAID 0 - Software
(data partition)
RAM (amount, type): 2048M DDR-400 PC-3200 (2x 1G, 0x open)
SW type:      CentOS 4 - 64 bit

Object type:  Server
Asset tag:    2724
Visible label:  web5-XXXXX (unused)
Chassis:      SuperMicro SC811T-260 1U Rack-mount Chassis
CPU:   AMD Athlon 64 3400+, 128K L1, 512K L2, 400mhz FSB
HD1:   160GB SATA
HD2:   160GB SATA
Mobo Type / Model:  Gigabyte GA-K8VM800M Main Board, VIA K8M800 Chipset
NIC Type:      on-board VIA 100/10 NIC
Power Supply:       SuperMicro 260watt 1U Power Supply
RAID Type (level, hw/sw):   RAID 1 - Software
RAM (amount, type): 2048M DDR-400 PC-3200 (2x 1G, 0x open)
SW type:      CentOS 5 - 32 bit

 **TELECOM**

Page 33

Confidential

## EXHIBIT D – BILL OF SALE

For good and valuable consideration, receipt of which is hereby acknowledged, the undersigned,

**David Szostek, 100% Stockholder of UV2, Inc. ("SELLER")**, hereby assigns, convey and transfer over unto EMC Telecom Corporation (**"EMCT"**), all of his right, title and interest, if any, in and to the Approved Assets of Target as defined in that certain Asset Purchase Agreement between Seller and EMCT dated as of the ____ day of December 2008 (the "Purchase Agreement").

The purchase price for the Approved Assets is $673,815USD, as defined in Article 2 of the Purchase Agreement.

THE APPROVED ASSETS ARE BEING SOLD "AS-IS, WHERE-IS" WITH NO WARRANTIES OR REPRESENTATIONS WHATSOEVER, EXCEPT AS EXPRESSLY PROVIDED IN THE PURCHASE AGREEMENT, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

IN WITNESS WHEREOF, the parties hereto have caused this Bill of Sale to be executed as of the ____ day of December 2008.

PURCHASING COMPANY: EMC TELECOM CORPORATION

Signed _____     Print: Name Erik Zeiner

Title: Secretary/GM          Date:_____

SELLING COMPANY: UV2, Inc.

Stockholder: David Szostek

Signature:_____Date:_____

**emc** TELECOM                              Page 34                    Confidential

## EXHIBIT E – ACCOUNTS RECEIVABLE LISTING

As of 12/19/08:

DV  —  $22,174,47   ($5,674.47 est EOM)

VMM  —  $0

INV  —  $0


TELECOM

Page 36                                      Confidential

## EXHIBIT F-1 – MATERIAL CONTRACT LISTING

Please list all Material Contracts related to the Target that will be included in the Assignment and Assumption Agreement.

– Asset contracts only

| Parties Listed | Effective Date | Term | Summary |
|---|---|---|---|
| 1) DV | 11/1/08 | 36 mos | |
| 2) VMM | 4/1/07 | 25 mos | |
| 3) INU | 5/1/08 | 25 mos | |
| 4) | | | |
| 5) | | | |
| 6) | | | |
| 7) | | | |
| 8) | | | |
| 9) | | | |
| 10) | | | |
| 11) | | | |
| 12) | | | |
| 13) | | | |
| 14) | | | |
| 15) | | | |
| 16) | | | |
| 17) | | | |
| 18) | | | |
| 19) | | | |
| 20) | | | |
| 21) | | | |
| 22) | | | |
| 23) | | | |
| 24) | | | |
| 25) | | | |



## EXHIBIT G – SELLER' DISCLOSURE STATEMENT

PLEASE LIST ALL LEGAL PROCEEDINGS THAT THE TARGET IS PARTY TO. (This may be attached as a separate document)

                         *N/A*

PLEASE LIST ANY INSURANCE THAT TARGET CURRENTLY HAS. (This may be attached as a separate document)

*Business property + liability – 250k/equipment, 1MM liability, started 5/06*

*E+O – 250k w/5k retention starting 10/17/08*

PLEASE LIST ANY FINANCIAL STATEMENT CHANGES THAT YOU WISH TO MAKE EMCT AWARE OF PRIOR TO CLOSING THAT MAY HAVE BEEN OVERLOOKED AND WILL AFFECT FINANCIAL STATEMENT IN ANY WAY. (This may be attached as a separate document)

                         *N/A*

PLEASE LIST ANY EXCLUDED ASSETS YOU WISH NOT TO BE A PART OF THIS TRANSACTION. (This may be attached as a separate document) *N/A For asset purchase agreement. See exhibit C for approved assets + exhibit F-1 for a list of purchased assets.*

PLEASE LIST ALL BUSINESS ACTIVITIES YOU WILL CONTINUE TO PERFORM AFTER THIS TRANSACTION. (This may be attached as a separate document) *Any other businesses UV2, Inc and its subsidiaries have developed, own, and/or operate prior to this asset purchase. This includes, but is not limited to: UV Backups and UV Uptime.*

PLEASE LIST ALL REAL ESTATE PROPERTY IN WHICH THE TARGET HOLDS AN INTEREST. (This may be attached as a separate document) *UV Hosting does not own any real estate and none is listed in approved assets.*

PLEASE LIST ANY OTHER ENTITIES IN WHICH THE TARGET HOLDS AN EQUITY INTEREST. (This may be attached as a separate document) *UV Hosting does not own any equity interests and none are listed in the approved asset exhibit.*

PLEASE LIST ALL TAX BENEFITS AND LIABILITIES THE TARGET CURRENTLY HOLDS. (This may be attached as a separate document) *UV Hosting does not have any tax benefits/holds. If there were any, they shouldn't apply as this is an asset purchase.*

PLEASE LIST ANY SERVICE AND/OR CONTRACT FEES THAT THE TARGET NORMALLY PAYS AND THAT SHOULD BE CARRIED OVER. (This may be attached as a separate document) *N/A due to asset purchase.*

I hereby certify that the foregoing statements are true and correct to the best of my knowledge.

SELLING COMPANY: UV2, Inc.

Owner: David Szostek

Signature: _____ , President Date: 12/17/08

12/18/2008 18:43 FAX                                → BUSINESS-FAX      ☑ 001/002

 **TELECOM**                       Page 33                    Confidential

## EXHIBIT D – BILL OF SALE

For good and valuable consideration, receipt of which is hereby acknowledged, the undersigned,

**David Szostek, 100% Stockholder of UV2, Inc. ("SELLER")**, hereby assigns, convey and transfer over unto EMC Telecom Corporation ("EMCT"), all of his right, title and interest, if any, in and to the Approved Assets of Target as defined in that certain Asset Purchase Agreement between Seller and EMCT dated as of the 1̲5̲ day of December 2008 (the "Purchase Agreement").

The purchase price for the Approved Assets is $673,615USD, as defined in Article 2 of the Purchase Agreement.

THE APPROVED ASSETS ARE BEING SOLD "AS-IS, WHERE-IS" WITH NO WARRANTIES OR REPRESENTATIONS WHATSOEVER, EXCEPT AS EXPRESSLY PROVIDED IN THE PURCHASE AGREEMENT, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

IN WITNESS WHEREOF, the parties hereto have caused this Bill of Sale to be executed as of the 1̲5̲ day of December 2008.

PURCHASING COMPANY: EMC TELECOM CORPORATION

Signed _____          Print: Name Erik Zalner

Title: Secretary/GM          Date: December 18, 2008

SELLING COMPANY: UV2, Inc.

Stockholder: David Szostek

Signature: _____ , President  Date: 12/18/08

         Page 25             **Confidential**

law for money damages if this Agreement has not been performed in accordance with its terms, and therefore agrees that the other party will be entitled to specific enforcement of the terms hereof in addition to any other remedy to which it may be entitled, at law or in equity.

ABOVE CONDITIONS ARE HEREBY APPROVED AND ACCEPTED:

EMC TELECOM CORPORATION:

Erik Zaney, Secretary/GM
EMC TELECOM CORPORATION
4604 S POWER RD
Suite #103-147
Mesa, AZ 85212

Date: Thursday, December 18, 2008

86-0434956
EIN

**SELLER'S ACCEPTANCE**

WE ACCEPT the foregoing offer and agree to sell the above described business and assets on the terms and conditions of the foregoing Asset Purchase Agreement.

DATED and ACCEPTED on this the Thursday, December 18, 2008.

Seller: UV2, Inc.

Stockholder: David Szostek

Signature: _____ President

Seller EIN: 20-2000488

Target Address: 648 Monroe Avenue NW, Suite B007, Grand Rapids, Michigan 49503