**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UV2, LLC, a Michigan limited liability company, as successor interest to UV2,<br><br>      Plaintiff/Judgment Creditor,<br><br>vs.<br><br>EMC TELECOM CORPORATION, an Arizona corporation, now known as EMCT ACQUISITIONS, INC.,<br><br>      Defendant/Judgment Debtor.<br><br>DIGITAL VENTURES, LLC,<br><br>      Garnishee. | No. CV 10-01269-PHX-ROS<br><br>**REPORT AND RECOMMENDATION** |

TO THE HONORABLE ROSLYN O. SILVER, UNITED STATES DISTRICT JUDGE:

This matter arises on Plaintiff/Judgment-Creditor UV2, LLC's ("Plaintiff") Application for Judgment Against Garnishee Digital Ventures, LLC ("Garnishee"), filed on March 8, 2012 (Doc. 29.) Plaintiff seeks entry of Judgment against the Garnishee for nonexempt monies in the amount of $502,173.00 purportedly belonging to Defendant/Judgment-Debtor EMC Telecom Corporation ("Defendant"). On May 17, 2012, United States Chief District Judge Roslyn O. Silver referred this case to the undersigned for post-judgment garnishment proceedings. (Doc. 33.)

1    A review of the record demonstrates that on August 20, 2010, the Court[1] entered judgment for Plaintiff and against Defendant in the amount of $502,173.00 as principal, with interest accruing at the rate of 6% per annum from August 24, 2009, plus Arbitrator fees in the amount of $4,005.00 and costs in the amount of $404.80.  (Doc. 12.)

On March 8, 2012, Plaintiff filed an Application for Writ of Garnishment against the Garnishee alleging that Plaintiff "has good reason to believe, and therefore alleges, that the Garnishee [] is holding nonexempt monies on behalf of the Judgment-Debtor and/or has in its possession nonexempt personal property belonging to the Judgment/Debtor."  (Doc. 29.) On March 9, 2012, a Writ of Garnishment was issued to the Garnishee requesting that the Garnishee file an Answer to the Writ. (Doc. 30.) On September 4, 2012, Garnishee filed its Answer avowing that it "does not have money or property belonging to judgment debtor." (Doc. 39.)   Plaintiff filed an Objection and Request for Hearing Regarding Garnishee's Answer.  (Doc. 40.)  This Court held a hearing on October 11, 2012, and ordered that Plaintiff file a memorandum in support of its objection, and set a briefing schedule for the parties.  (Doc. 42.)  Thereafter, Plaintiff filed its Memorandum on October 19, 2012 (Doc. 43). Garnishee filed a Response, (Doc. 44), and on November 7, 2012, Plaintiff filed a Reply (Doc. 45).  Neither party requested oral argument, and this Court finds that the parties have fully briefed the issues and oral argument will not aid in the Court's decision.  See Partridge v. Reich, 141 F.3d 920, 926 (9th Cir. 1998); Lake at Las Vegas Investors Group, Inc. v. Pacific Malibu Development Corp., 933 F.2d 724, 729 (9th Cir. 1991).

## BACKGROUND

On May 21, 2009, Garnishee entered into a website hosting agreement ("the Contract") with Defendant.  (Doc. 43, Exh. 1.)  Under the Contract, Defendant agreed to provide webhosting for Garnishee's website.  (Doc. 44, at 2.)  The Term of the Contract ended on October 31, 2011. (Doc. 43, Exh. 1 at 2, ¶5.2.)  By July 1, 2009, Garnishee had a balance due to Defendant of over $25,000.00 under the Contract. (Doc. 43, Exh. 2.)  On

---

[1] For purpose of clarity, "the Court" will refer to the Presiding Judge, and "this Court" will refer to the Magistrate Judge.

1  December 22, 2009, Defendant notified Garnishee of its intent to terminate the Contract.
2  (Id., Exh. 3.)  At that time, Garnishee owed Defendant over $60,000.00.  (Id., Exh. 2.)  The
3  Contract Early Termination Provision provided as follows:

> Provided no new Agreement exists at end of Term, the expiring Agreement will renew for successive thirty-six (36) month terms, unless written notice of non-renewal is provided by either Party, upon at least one hundred and twenty (120) days (before the effective date of termination), and by paying, in advance, a termination fee equal to twenty-four (24) months (or, if less, the number of months remaining in Term) times the monthly average total fees for the six most recent months (or, if less than six, all the months in the Term) ending before the date of notice.

8  (Doc. 43, Exh. 1, at 2 ¶5.3.)

9  Plaintiff argues in its Memorandum that Defendant was entitled to an early termination
10 fee of $907,183.27, under the Early Termination provision of the Contract.  (Doc. 43, at 3.)
11 Garnishee disputes that this provision applies.  The provision is notably ambiguous, because
12 it conflates contemplation of simple, end of Term (October 31, 2011), notice of non-renewal,
13 with termination of Contract before Contract Term expiration.  Otherwise, the consequence
14 for not providing the 120-day, prior to Contract expiration, notice would never equal 24
15 months, and would always be less than six months, and the number of most recent months
16 fees to average would never be less than six.  The "qualifiers," logically, can only contemplate
17 a notice of termination before the Contract end of Term, which is the issue here.  The
18 determination of whether or not this provision applies to the calculation of the debt at issue
19 however, is mooted by Plaintiff's willingness, as indicated in its Reply Memorandum, to
20 abandon calculation of debt based upon the Termination provision, and instead calculate the
21 debt based upon the minimum charges under the Contract, which it calculates as follows:

22 •  1 x Hardware Fee at $10,000/mo [per ¶3.2 of Contract]     =$10,000
23 •  1 x Managed Service Fee at $400/mo. [per ¶3.3]            =$400
24 •  1 x Backup Fees at $1,000/mo. [per ¶3.5]                  =$1,000
25 •  1 x Flash Media Server Fee at $400/mo. [per ¶3.5.1]       =$400
26 •  4,000 x Digital Storage Vault Fee at .25 [per ¶3.5.3]     =$1,000
27 •  20,000 x GB of Bandwidth at .80 [per ¶¶3.1, 3.1.1]        = $16,000
28          Total = $28,800/monthly minimum x 22 months = $633,600

(Doc. 45, at 4-5.)

Other than the Termination provision, Garnishee does not dispute the other terms of the Contract, or that it was in default in December, 2009. Garnishee claims, however, that Defendant fraudulently invoiced Garnishee for bandwidth usage. In support of its claim, Garnishee references various correspondence between Garnishee and Defendant. All of the communication referenced occurred on December 11, 18, 19 and 22, 2009.

The first communication in the record, dated December 11, 2009, is a memo from Eric Zeiner (hereinafter "Zeiner") of Defendant EMC, to S.D. DeLong (hereinafter "DeLong") of Garnishee Digital Ventures. (Doc. 44, Exh. 1.) The memo gives notice of the "closure and sale of Amateur Straight Guys," and the liquidation of all other assets owned by the company and the permanent closure of Garnishee. (Id.) Zeiner gives notice that Garnishee "is broke," and that the decline of Amateur Straight Guys "was multi-faceted in its genesis as we had many business and personal issues that contributed." (Id.) Zeiner continues:

> As I know you are aware, our company is broke. Despite the loyalties of the customers who have hung in there our revenues have sunk far below our expenditures and Justin and I are both of the opinion that its time to throw in the towel on this venture. In order to achieve our goal of a seamless transition of ownership for remaining [Amateur Straight Guys] customers we are in negotiations with our merchant and card processing vendors and now you to continue to provide service and to potentially consider establishing a vendor relationship with the new ownership should they choose to continue with your company.
> ...
> As you are aware and as we have discussed many times our billing issues with EMC were a major contributor to the financial downfall of [Garnishee]. ... This being the case we are still baffled how invoicing occurs with EMC and exactly what we are paying for. I have requested several times for us to sit down and go over the invoice in detail so I understand exactly what we have been billed for, rates etc. This has yet to occur.
> ...
> Finally in regards to bandwidth I have previously advised you that the overage in bandwidth which was mysterious in its origins is still a mystery to us as the implementation of our relationship with Edgecast for streaming services offloaded our highest bandwidth demands off of [Defendant].

(Doc. 44, Exh. 1.)

The next communication in the record is an email dated December 18, 2009, from DeLong to Zeiner cancelling a meeting. (Doc. 43, at 28.) Zeiner responds that "[i]f we don't talk today your account will be terminated according to accounting. It is imperative we talk

- 4 -

1  today at least via phone.  Accounting will not wait another week and will not deal with this
2  over the Xmas holidays. They were already upset they had to wait another week for today's
3  meeting and by you rescheduling at the last minute, will not bode well with the current
4  situation." (<u>Id.</u>)  DeLong responds: "Chuck will be able to meet via phone today and I will
5  set up a call in number.  I will attend via phone as well.  I want to work with you too which
6  is why I am trying to bring us all to the table for months now.  To intimate that I have not
7  been working with you is false.  I don't understand why you would suggest that I haven't
8  been." (<u>Id.</u>, at 27.)  Zeiner responds shortly thereafter:

> I've been available for all those months to do the table meeting so hopefully you are not saying it never happened due to anything on our end.  The purpose of the table meeting is to go over all contract and billing info.  You need to see everything with your own eyes and be explained everything so that it is clear cut and there are no questions as to how things were attained.  A phone conversation doesn't work as we have already tried in the past with you and many of your staff.
>
> I need to know when we can have this sit down, visual explanation with you and it cannot be delayed much further.
>
> I would much rather get this Meet up set for sure next week to determine what your proposed offer is regarding the contract termination and settlement, your proposed DV sale, what your needs are in the meantime, and what our problems are in relation to supporting your setup with little to no payment.
>
> Yes your $500 is something, but it doesn't come close to we are losing supporting your setup daily, with no hope of recovering the loss.

(<u>Id.</u>)

19       The parties discuss a meeting on Tuesday.  The next email in the thread on December
20  18, 2009, is sent from Zeiner to DeLong, and discusses a proposed settlement:

> I am being told that accounting will only hold the current setup of $500 daily deposits if we finalize a settlement on the contract by end of next week. ...
> They are asking that regardless of the past due amounts ($62K), which we can hash out in the meet-up ... what is to happen with the future contracted amounts ($1.2m), and equipment costs ($200k) we are stuck paying. ...
> I have been given preliminary authorization to make an informal offer of 50% settlement to release DV and owners from the remaining contract term obligations, to be paid out of asset sale.  That amount would be 50% ($448,683.42) of the remaining contract balance, ($898,366.84) as stipulated by the contract.

(Doc. 43, at 30-31.)

27       Zeiner also references sending attachments in a separate email "for discussion at our
28  meeting, i.e. billing docs, contract stuff, breakdowns of equipment, etc. for reference when

- 5 -

1 we chat so you have full disclosure." (Id., at 32.) The last email in the thread on December 2 18, 2009, is an email from Zeiner to DeLong with numerous attachments, described variously 3 as invoices, equipment comparison, and one described as "DV_Bandwidth_9mos.xls = a 9- 4 month export direct from cacti bandwidth system that you have access to for verifying 5 bandwidth." (Id., at 25.)

6   On December 19, 2009, De Long responds to Zeiner's email:

> As I'm sure you are very aware we are broke. Yes the sale of the site will be used to pay you what we feel/ and hopefully mutually agree to in terms of projected contract terms however we are not in a position to give you everything we have Eric. It won't happen. Now, will we be fair? Absolutely. Will we be exceptionally inquisitive and investigative re: such charges and claims? You can count on it. Rattling the legal sabre is not necessary Eric we are fully aware of our obligations and simply seek to understand them better and if they are legitimate (big if) then we will comply with whatever we can.

(Doc. 43, at 30.)

12   On December 22, 2009, Garnishee's corporate counsel wrote a letter to Zeiner 13 proposing a settlement, that would include a payment by Garnishee to Defendant of 14 $100,000.00. (Doc. 44, Exh. B.) The last email correspondence provided is one sent on 15 February 18, 2010, from De Long to Garnishee's corporate counsel, in which he 16 acknowledges that "there are major creditors out there who will come after us if we don't pay 17 them (EMC, MCS etc.) however as far as reaching to our assets is concerned once our major 18 asset (ASG) is sold and since no claim on our assets has been made thus far I am certain that 19 any assets we sold would be beyond the reach of the courts." (Id., at 35.)

20   The above communication between Garnishee and Defendant establish clearly that 21 Garnishee was in default on the Contract, that Garnishee disputed some of the charges[2], and 22 that both parties attempted to settle the matter, with no success. Garnishee paid a total of

---

[2] Furthermore, the Contract provide that "[i]f Customer disputes any charges, it must log the dispute by completing and submitting a dispute request via [Defendant]'s website, or via email, or by contacting [Defendant]'s staff via telephone," and must be submitted "within 5 calendar days of the date of the invoice associated with the disputed charges, or the invoice shall be deemed correct and all rights to dispute such charges are waived." (Doc. 43, Exh. 1, at 7 ¶16.) There is no evidence in the record that Garnishee followed these procedures.

$262,990.00 to Defendant for the eight month period from May 2009 to December 2009. (Doc. 44, at 7.) Garnishee argues that the communication establishes that Defendant's invoicing for bandwidth use was fraudulent, and therefore Garnishee should be immune from garnishment.

## ANALYSIS

Generally, a federal writ of garnishment is governed by the law of the state in which the district court sits. See Fed.R.Civ.P. 69(a)[3]; Hilao v. Estate of Marcos, 95 F.3d 848, 851 (9th Cir. 1996). Under Arizona law, "garnishment reaches only debts existing at the time of the service of the writ." Reeb v. Interchange Resources, Inc. of Phoenix, 478 P.2d 82, 84 (Ariz. 1970). "[I]t is well settled in Arizona that the rights of a garnishor-creditor to assets in the hands of a garnishee are no greater than rights of the defendant-debtor to those assets." Webster v. USLife Title Co., 598 P.2d 108, 110 (Ariz. Ct. App. 1979) (citing Mid-State Electric Supply Co. v. Arizona Title Insurance & Trust Co., 464 P.2d 604, 606-07 (Ariz. 1970)).

In order to determine the liability of the garnishee, a court must look to the facts as they were found to exist at the time the writ was served. As of the time of service, there must be a clear, ascertainable debt existing to the defendant, a debt not contingent upon other events. Able Distributing Co., Inc. v. James Lampe, General Contractor, 160 Ariz. 399, 402 (App. 1989) (internal cites and citation omitted). "Merely because a debt is disputed does not mean that it is 'contingent.'" Id. "Where further performance of a contract is necessary before money payment is due, it is generally held that the obligation to pay the money is not subject to garnishment until the condition has been filled." Id., at 403. A debt is contingent for purposes of garnishment if it is one that may never become due and payable. Id., at 405. On

---

[3] Rule 69(a), Fed.R.Civ.P., provides in pertinent part:
A money judgment is enforced by a writ of execution, unless the court directs otherwise. The procedure on execution – in proceedings supplementary to and in aid of judgment or execution – **must accord with the procedure of the state where the court is located**, ... .
(emphasis added).

- 7 -

1 the other hand, the denial of liability or assertion of a counterclaim for faulty performance
2 does not render the obligations so uncertain or contingent as to make it not subject to
3 garnishment. Id.

4     The record before this Court is clear that a Contract between Garnishee and Defendant
5 was entered into that contained certain essential terms to conclude that it was a binding
6 contract: it contained a clear beginning and termination date, it contained clear minimum
7 obligations, and clear compensation terms. The parties commenced performance and there is
8 no claim that the Contract itself was invalid.  Garnishee argues, however, that Defendant
9 fraudulently billed Garnishee for bandwidth usage in excess of what was actually used by
10 Garnishee.  Garnishee submits evidence, in the form of various correspondence, between
11 Garnishee and Defendant that, in this Court's view, only amounts to proof that Garnishee had
12 notified Defendant of its belief that fraud had occurred in the billing, but not evidence of fraud
13 sufficient to void an otherwise valid contract.  Likewise, evidence that the parties discussed
14 a possible settlement of the dispute does not render the Contract invalid.

15     Even if Garnishee was able to establish that Defendant had billed Garnishee for
16 bandwidth that had not been used, Plaintiff has agreed to seek garnishment of only the
17 minimum charges on the remaining unfulfilled term of the Contract, $633,600.00, as set forth
18 on page 3 above.  Plaintiff's judgment against Defendant is less than that amount (currently
19 $602,753.55). During the evidentiary hearing set before this Court on October 11, 2012,
20 Plaintiff and Garnishee indicated that, should this Court find it useful in resolving the issue
21 before this Court, Garnishee's Principle DeLong, could be deposed and his testimony
22 provided to this Court.  This Court finds, upon consideration of all of the above, DeLong's
23 statements would not be useful in the resolution of this matter.  This Court will therefore
24 recommend that Plaintiff's Objection to Garnishee's Answer be granted, and that the Writ of
25 Garnishment, (Doc. 30), is valid.  This Court will further recommend that Plaintiff be given
26 seven (7) days from the date of the Court's Order adopting this Court's Report and
27 Recommendation to file a proposed judgment, consistent with the terms of the Court's Order.
28

1    In accordance with the foregoing,

2    **IT IS HEREBY RECOMMENDED** that Plaintiff's Objection to Garnishee's
3    Answer, supported by Plaintiff's Memorandum, (Docs. 40, 43), is **GRANTED**, and that
4    Plaintiff shall have seven (7) days from the Court's Order adopting this Report and
5    Recommendation to file a proposed judgment against Garnishee, consistent with the terms of
6    the Court's Order.

7    This recommendation is not an order that is immediately appealable to the Ninth
8    Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of
9    Appellate Procedure, should not be filed until entry of the District Court's judgment.  The
10   parties shall have fourteen (14) days from the date of service of a copy of this
11   recommendation within which to file specific written objections with the Court.  See 28
12   U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(b) and 72.  Thereafter, the parties have fourteen (14)
13   days within which to file a response to the objections.  Failure to timely file objections to the
14   Magistrate Judge's Report and Recommendation may result in the acceptance of the Report
15   and Recommendation by the district court without further review.  See United States v.
16   Reyna-Tapia, 328 F.3d 1114, 1121 (9th Cir. 2003).  Failure to timely file objections to any
17   factual determinations of the Magistrate Judge will be considered a waiver of a party's right
18   to appellate review of the findings of fact in an order of judgment entered pursuant to the
19   Magistrate Judge's recommendation.  See Fed.R.Civ.P. 72.

20   DATED this 19th day of November, 2012.

22   *Michelle H. Burns*
     Michelle H. Burns
23   United States Magistrate Judge